**In re GREAT WESTERN DRILLING, LTD.**

**No. 11-06-00244-CV.**

Court of Appeals of Texas, Eastland.

Nov. 30, 2006.

R. Brad Miller, Kerr, Ward, McLaughlin & Miller, L.L.P., Midland, for relator.

James M. Chaney, Kirk & Chaney, Oklahoma City, OK, Michael T. Morgan, Bullock, Scott, Neisig, Morgan, Leeton & Strauss, P.C., Richard E. Booth, Lynch, Chappell & Alsup, P.C., Midland, for real parties in interest.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

RICK STRANGE, Justice.

This is a mandamus proceeding complaining of the trial court's order compelling the parties to attend binding arbitration. Great Western Drilling, Ltd. filed a declaratory judgment action against several working interest owners seeking a declaration regarding the parties' relative rights, duties, and obligations concerning a property described as the NE Linker Prospect. Great Western also sought a declaration that arbitration provisions in two joint operating agreements did not apply to this dispute. Pathfinder Oil & Gas, Inc. intervened in the litigation and sought similar declaratory relief.

The working interest owners asked the trial court to compel arbitration and stay the litigation. Great Western responded with a motion to stay arbitration, conduct an evidentiary hearing, and compel discovery. The trial court granted the working interest owners' request, ordered the parties to arbitration, and stayed the litigation. Great Western filed a petition for writ of mandamus with this court. The writ is conditionally granted.

### I. Background Facts

Great Western, Pathfinder, and the working interest owners entered into a letter agreement to develop a prospect referred to as the "Latigo Project." The agreement required the drilling and completion of an initial test well in the Strawn formation and the reentry of the Jackson No. 1 well to test the Lower Clearfork formation. Both wells were designated obligatory wells. The agreement contemplated drilling optional wells in areas referred to as the Linerider Prospect and the South Levelland Prospect.

The letter agreement required the parties to execute a 1989 A.A.P.L. model form joint operating agreement (JOA) naming Great Western as the operator for the Strawn and Lower Clearfork reservoirs. Two JOAs were executed. One governed the Latigo Prospect–Strawn Prospects, and the other governed the Latigo Prospect—Jackson Lower Clearfork. Both agreements included the model form's liability limiting paragraph.[1] The parties added their own area of mutual interest (AMI) provision, arbitration provision, and confidentiality provision. Both JOAs defined the "Contract Area" to "mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement," and both included an exhibit listing the leases.

The Texas Supreme Court defined an AMI as an "agreement [in which] the parties attempt to describe a geographic area within which they agree to share certain additional leases acquired by any of them in the future." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 905 (Tex. 1982). The JOAs defined the AMI contract area as the acreage shown within a bold outline on an attached plat and provided that "the outline on said plat shall be considered a line having no width, running along the nearest boundary line of any separately surveyed section or labor appearing on said plat." Any party acquiring or proposing to acquire certain interests in the contract area within three years of the date of the letter agreement was required to give notice of the acquisition and its terms to all other parties who then had thirty days to decide if they wished to participate.[2]

The JOAs' arbitration and confidentiality provisions read as follows:

> P. Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement or the breach or validity thereof ("Dispute") shall be referred to and finally settled by final and binding arbitration in Houston, Harris County, Texas. The term "Agreement" includes the contract itself and all exhibits and attachments.... Upon the request of any party, whether made before or after the institution of any legal proceedings, any Dispute shall be resolved by

1. This paragraph provides:
 The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be consid-

ered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

2. These interests were described as:
 [A] leasehold interest, royalty interest, overriding royalty interest, production payment, mineral interest or other interest in oil, gas or minerals, farmin, seismic and/or drilling option, including an extension or renewal of a presently held interest, either directly or indirectly, on land within the AMI (such interest, insofar and only insofar as they cover lands within the AMI being herein called "Acquired Interests").

binding arbitration by three arbitrators. The parties agree to use the Commercial Arbitration Rules of the American Arbitration Association and, to the maximum extent possible, the Federal Arbitration Act (Title 9 of the United States Code).... The transactions contemplated by this Agreement are transactions involving or related to commerce.... The arbitrators shall not have the authority to award, and the tribunal shall not award, any damages or compensation for loss of prospective profits or special, indirect or consequential damages, punitive damages, or exemplary damages in connection with any Dispute, or any attorney's, expert witness, or other such fees or costs.

Q. Each party hereto agrees that all data and information acquired pursuant to this Agreement shall be confidential and shall not be disclosed by them to any person or corporation who is not a party to this Agreement without the prior written consent of the other parties for a period of three (3) years from the date hereof.

In 2004, Great Western acquired oil and gas leases in Labors 1 and 10 of League 29, Hockley County, Texas, for a project named the NE Linker Prospect. The NE Linker Prospect was not included in either JOA's contract area or area of mutual interest, but it was adjacent to the Latigo—Strawn Prospect JOA's AMI contract area. Great Western did not offer the working interest owners an opportunity to participate in this acquisition. The working interest owners contend that they did not know Great Western was acquiring the offsetting leases and that its acquisition was motivated by geological information which they helped pay to develop.

Also in 2004, Great Western proposed drilling a well known as the Airfield No. 2.

This well was in the Latigo–Strawn Prospect JOA's contract area, near the eastern boundary of the Latigo Project. The Gulf Group and Santa Rosa alleged that they separately contacted Great Western because of their concern about the lack of offset acreage and were both told not to worry because Great Western was acquiring acreage and would handle the land aspects of the matter.

In 2005, Great Western drilled and completed two commercially successful wells in the NE Linker Prospect. The working interest owners describe these as offset wells and contend that they were completed in the Lower Clearfork—which is the same formation from which the Airfield No. 2 is producing—and that the offset wells have reserves worth several million dollars. In 2006, they filed a demand for arbitration and requested the opportunity "to participate in properties developed as a direct result of the investment made by them in the Latigo Project."

The working interest owners stated in the contentions section of their Arbitration Statement that Great Western and Pathfinder owed fiduciary, contractual, and common law duties to them and that:

Pathfinder and Great Western ignored their duty to keep all information acquired during the parties' venture confidential. They ignored their duty to use information bought and paid for the (sic) by the venture only in matters that were in the best interests of the venture's members. They used the information to acquire offsetting acreage solely for their own benefit. These actions amount to breach of contract, breach of fiduciary duty and fraud.

The working interest owners requested monetary damages, an assignment of the interests they would have received but for Pathfinder and Great Western's wrongful actions, and a judgment directing Pathfin-

der and Great Western to disgorge all profits made as a result of their fraud, breach of fiduciary duty, and breach of contract.

## II. *Issues*

Great Western's petition presents five issues:

1. Is mandamus available to review an order compelling arbitration?

2. Did the trial court abuse its discretion in ordering arbitration?

3. Did the trial court abuse its discretion by refusing to conduct an evidentiary hearing?

4. Did the trial court abuse its discretion in refusing to compel discovery on disputed fact issues relating to the scope of the arbitration agreements?

5. Does Great Western have an adequate remedy at law?

## III. *Standard of Review*

■ The arbitration clauses provide that the Federal Arbitration Act (FAA)[3] applies to the maximum extent possible. When Texas courts are called on to decide if disputed claims fall within the scope of an arbitration clause under the FAA, Texas procedure controls that determination. *In re Champion Techs., Inc.,* 173 S.W.3d 595, 598 (Tex.App.-Eastland 2005, no pet.).

■ We review orders compelling arbitration under the FAA for an abuse of discretion. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or acts in an arbitrary or unreasonable manner. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985). When reviewing matters committed to a trial court's discretion, an appellate court may not substitute its own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). Nor may a reviewing court set aside the trial court's determination unless it is clear from the record that the trial court could only reach one decision. *Id.* at 840.

■ The trial court's interpretation of the arbitration agreement itself is a legal question subject to de novo review. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). Arbitration agreements are interpreted under traditional contract principles. *Id.* Our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enters. v. La Guarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex. 1980). We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). No single provision taken alone will be given controlling effect. All the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.,* 361 S.W.2d 193, 196 (Tex.1962). The contracts are construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987).

## IV. *Discussion*

### A. *Is Mandamus Available?*

The working interest owners contend initially that, because the arbitration agreement is subject to the FAA, the trial court's order compelling arbitration is not reviewable by mandamus. The Texas Supreme Court recently addressed this issue

---

**3.** *See* 9 U.S.C. §§ 1–16.

in *In re Palacios,* No. 05–0038, —— S.W.3d ——, 2006 WL 1791683 (Tex. June 30, 2006). There, the court noted that an order denying arbitration under the FAA is reviewable by mandamus but that federal courts did not allow the review of an order compelling arbitration until the entry of a final judgment. *Id.* at *2, —— S.W.3d at ——. Here, the trial court compelled arbitration and stayed the litigation rather than dismissing it. Therefore, as discussed in *Palacios,* because there is no final judgment, because the trial court compelled arbitration rather than denying it, and because the litigation was stayed rather than dismissed, mandamus normally would be inappropriate.

However, the court stopped short of saying mandamus is never available when the litigation is merely stayed. The court noted that the Fifth Circuit allowed mandamus review if a party could "show 'clearly and indisputably that the district court did not have the discretion to stay the proceedings pending arbitration.' " *Id.* (quoting *Apache Bohai Corp., LDC v. Texaco China, B.V.,* 330 F.3d 307, 310 (5th Cir. 2003)). Because the court concluded that the relator had not met this "particularly heavy mandamus burden," it denied the petition for mandamus. *Id.*

■ Although the court did not specifically hold that orders compelling arbitration are reviewable by mandamus, its analysis suggests that mandamus relief was possible if the relator had satisfied this heightened burden of proof. We will, therefore, review the record to determine if Great Western has demonstrated clearly and indisputably that the trial court lacked the discretion to stay the proceedings pending arbitration. Great Western's first and fifth issues are sustained.

B. *Did the Trial Court Abuse Its Discretion by Not Providing for an Evidentiary Hearing or Allowing Limited Discovery?*

■ This court has previously recognized that trial courts are required to summarily decide motions to compel arbitration. *See Champion Techs.,* 173 S.W.3d 595. In that case, the trial court deferred ruling on a motion to compel arbitration to allow the parties time to conduct discovery. We noted that the expedited disposition of a dispute is one of arbitration's primary benefits and that the legislature has mandated expedited consideration of motions to compel arbitration. *Id.* at 599. Delaying a decision on a motion to compel arbitration until after discovery is completed, we found, defeated the goal of resolving arbitration issues promptly. Accordingly, we determined that the trial court abused its discretion by deferring a ruling until after the completion of discovery.

Great Western served requests for disclosure and requests for production on the working interest owners and asked them to tender fact witnesses with personal knowledge of the claims in the arbitration demand. Great Western contended this discovery was necessary to determine whether arbitration should be stayed or compelled. The record does not contain copies of the requests for production, the identity of the requested witnesses, or any description of the witnesses' expected testimony. In light of this, and the requirement that arbitration issues be summarily decided, we cannot say the trial court abused its discretion by denying any discovery.

Great Western also requested an evidentiary hearing to determine if the challenged wells were within the JOAs' AMI contract area, to determine if verbal representations attributed to it were in fact made, and to determine the basis for the working interest owners' allegation that it breached the JOAs' confidentiality provi-

sion. Great Western did not make a bill of exception. TEX.R.APP. P. 33.2. Furthermore, Great Western's evidentiary requests largely go to the merits rather than the scope of the arbitration agreement. Accordingly, we cannot say that the trial court abused its discretion by not conducting an evidentiary hearing. Great Western's third and fourth issues are overruled.

### C. Is This Dispute Within the Scope of the Arbitration Agreement?

#### 1. Determining the Scope of an Arbitration Provision.

■■■■ Courts, rather than arbitrators, decide whether and what issues a party can be compelled to arbitrate. *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1066 (5th Cir.1998). This requires that we determine if the parties' dispute is within the scope of their arbitration agreement, which is a question of law that we review de novo. *Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.*, 147 S.W.3d 507, 512 (Tex.App.-San Antonio 2004, no pet.).

■■■■ In making this determination, the merits of a claim are immaterial. *See Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.*, 183 S.W.3d 741, 749 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (even if it appears that a party's claim is frivolous, trial courts may not rule on the potential merits of a claim when determining whether the parties have agreed to submit an issue to arbitration). However, we do consider the terms of the arbitration agreement and the factual allegations pertinent to the claim. *In re*

*FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex.2001).

■■■■ A party seeking to compel arbitration under the FAA must establish that there is a valid arbitration clause and that the claims raised fall within its scope. *Id.* at 753. The first element includes gateway matters such as whether a valid arbitration clause exists and whether an arbitration clause is binding on a nonparty. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex.2005). Great Western does not contend the agreement is invalid. Its challenge is directed at the second element, contending that, because the disputed wells were drilled outside the AMIs' contract area, the arbitration agreement does not apply.

■■■■ The scope of an arbitration clause is governed by federal law. *Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 896 (Tex.App.-Austin 2006, no pet.). Arbitration is a matter of contract between the parties. A court cannot compel a party to arbitrate a dispute beyond the scope of its arbitration agreement. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).[4] However, the law favors arbitration, and our construction of the agreement must reflect this. "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

The parties' arbitration provision is broadly written and applies to any dispute,

---

**4.** *See Bates v. MTH Homes–Tex., L.P.*, 177 S.W.3d 419, 422 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (courts may not expand upon the terms of the contract or tolerate a liberal interpretation of it by reading into it an agreement to arbitrate when one does not other-

wise exist); *Belmont Constructors, Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d 352, 356 (Tex.App.-Houston [1st Dist.] 1995, no writ) (court cannot modify or rewrite an unambiguous contract to accommodate arbitration).

controversy, or claim arising out of or relating to the JOA. Courts have held that similar language can encompass a wide range of claims. *See, e.g., Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir.1975) (arbitration provision applying to "any controversy or claim arising out of or relating to this Agreement or the breach thereof" covered contract-generated or contract-related disputes however labeled); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 589 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (claims for diversion of business opportunities, discounting services to customers for personal benefit, and usurping opportunities for pipeline interconnects and facilities were subject to arbitration); *Dallas Cardiology Assocs., P.A. v. Mallick*, 978 S.W.2d 209, 214 (Tex.App.-Texarkana 1998, pet. denied) (claims of tortious interference with contract and defamation subject to arbitration).

The Waco Court recently considered a similar provision in *Dennis v. College Station Hosp., L.P.*, 169 S.W.3d 282 (Tex. App.-Waco 2005, pet. denied).[5] The court wrote that a dispute was within the agreement's scope "if the facts alleged 'touch matters,' have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that is subject to the arbitration agreement." *Id.* at 285 (quoting *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App.-San Antonio 2000, no pet.)).[6] The Waco Court held that an arbitration request should not be denied *"unless it can be said with positive assurance* that an

arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue." *Id.* at 286.

Other courts have taken a more restrictive approach when tort claims are asserted and arbitration is sought under a contractual provision. In *Associated Glass*, 147 S.W.3d at 513, the court held:

If a tort claim is so interwoven with the contract that it cannot stand alone, it falls within the scope of an agreement to arbitrate; if, on the other hand, a tort claim is completely independent of the contract and could be maintained without reference to the contract, it falls outside the scope of an agreement to arbitrate.

*Accord Loy v. Harter*, 128 S.W.3d 397, 403 (Tex.App.-Texarkana 2004, pet. denied); *Teco Pipeline*, 2 S.W.3d at 590; *Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 566 (Tex.App.-El Paso 1989, writ denied).

■ There is some common ground between these two approaches. First, the dispute need not be a contractual claim or arise under the contract for an arbitration clause in the contract to apply. For example, an allegation that the contract itself— as opposed to the arbitration provision— was fraudulently induced was a matter to be decided by the arbitrator in *Henry v. Gonzalez*, 18 S.W.3d 684, 691 (Tex.App.-San Antonio 2000, pet. dism'd by agr.).[7] *See also Associated Glass*, 147 S.W.3d at 513 (arbitration agreement applied to tort claims because they arose out of, or were

5. The agreement applied to "any controversy or claim arising out of or relating to this Agreement, or the breach thereof." 169 S.W.3d at 284.

6. *Accord AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 195 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

7. *Accord Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 932 (Tex.App.-Houston [1st Dist.] 1996, no writ) (arbitration agreement is separable from the entire contract and, therefore, is valid and enforceable in spite of an attack made on the contract as a whole).

related to, alleged contractual duties to build and repair buildings).

Second, courts have routinely examined separate agreements executed contemporaneously, by the same parties, for the same purposes, and as part of the same transaction, together. *See, e.g., Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 393 (5th Cir.2002); *Kirby Highland Lakes Surgery Ctr.*, 183 S.W.3d at 901–02 (court considered both a purchase and sale agreement and a partnership agreement when determining scope of arbitration agreement even though the arbitration provision was in the partnership agreement and the plaintiffs' claim was based solely upon the purchase and sale agreement). *But cf. Perlstein v. D. Steller 3, Ltd.*, 109 S.W.3d 36, 41–42 (Tex.App.-Corpus Christi 2003, pet. denied) (parties executed three agreements as part of the same transaction, but different agreements had different dispute resolution provisions; therefore, arbitration clause in one agreement did not apply to all disputes relating to the transaction).

■ Third, the nature of the parties' relationship is critical. If their sole relationship is established and governed by an agreement with an arbitration provision, their disputes are more likely to fall within the scope of the arbitration provision.[8] But when the relationship extends beyond the agreement or is governed by separate and independent agreements, arbitration is less likely. *See, e.g., Loy*, 128 S.W.3d at 397 (arbitration provision in employment agreement did not apply to claims arising from plaintiff's duties as a director).

■ However, courts are also in agreement that even broad arbitration provi-

sions have their limits. *See Pennzoil Exploration*, 139 F.3d at 1067 n. 8; *see also Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 36–37 (5th Cir.1990) (even broadly drafted provision did not reach any and all disputes between the parties).

### 2. Arbitration of Oil and Gas Agreements.

The Fifth Circuit considered the scope of an arbitration agreement in the context of oil and gas developmental activities in *Pennzoil Exploration*, 139 F.3d 1061. In that case, there were numerous agreements concerning the development of oil and gas reserves in the Apsheron Trend, an area located in the Caspian Sea offshore Azerbaijan. The agreements' signatories varied, as did their purpose and scope. Some, but not all, included arbitration provisions. The dispute was between Ramco and Pennzoil over rights in a Karabakh Prospect granted to Pennzoil by the Azerbaijan Government to satisfy obligations arising from work performed on a gas utilization project. Pennzoil refused to share any of these rights with Ramco. The court held that their dispute was subject to arbitration clauses in a JOA and an AMI. *Id.* at 1069–70.

The JOA and AMI covered the Apsheron Trend. *Id.* at 1063–64. Both agreements included arbitration provisions. The interest conveyed by the Azerbaijan government to Pennzoil in the Karabakh Prospect was outside the Apsheron Trend and thus outside the contract area of both agreements. *Id.* at 1064.

The court found that the JOA's and AMI's arbitration provisions still applied

because the JOA and AMI were part of a transaction involving several interrelated and interdependent agreements to secure developmental rights from the Azerbaijan Government. The gas utilization project, for which Pennzoil received its interest in the Karabakh Prospect, was a key factor in this transaction. It, and developments directly tied to that project, led to the execution of the subsequent agreements including the JOA and AMI. *Id.* at 1069. Consequently, notwithstanding the geographical restriction, the court found that the dispute was related to the JOA and AMI and was, therefore, subject to their arbitration clauses.

### 3. *The Parties' Arbitration Agreement.*

The record is absent any indication that the parties have a relationship beyond that created and governed by their letter agreement and the JOAs. Even though the disputed wells are outside the contract areas of the parties' agreements, the working interest owners make allegations which arguably are connected to their operation. The Gulf Group and Santa Rosa contend that, while circulating an AFE for the Airfield No. 2 (which is an activity specifically governed by the JOAs), the question of offsetting acreage was raised and promises were made by Great Western. The working interest owners allege further that Great Western's decision to pursue leases in Labors 1 and 10 was motivated by geological information they helped pay to develop. The letter agreement refers to geological and 3–D seismic interpretation and mapping costs as of closing, and it obligated the parties to pay these past costs and 100% of any other 3–D seismic

costs incurred prior to the completion of drilling operations on the four projects.

If the scope of the parties' arbitration agreement was determined solely by reference to the arbitration provision, this dispute is clearly arbitrable. Under the expansive test articulated by the Waco Court in *Dennis,* 169 S.W.3d 282, the parties' dispute touches matters which have a significant relationship with the JOAs, and it cannot be said with positive assurance that the arbitration clause is not susceptible of an interpretation which would cover their dispute. Under the more restrictive approach articulated by the San Antonio Court in *Associated Glass,* 147 S.W.3d at 513, the dispute still falls within the agreement's scope because it is not independent of the JOA. With the possible exception of the fraud claim, the working interest owners would need the letter agreement and JOAs to establish the nature and extent of Great Western's duty.

Of course, the JOAs are not interpreted solely by reference to their arbitration provisions. Instead, the entire agreement must be considered. *Myers,* 361 S.W.2d at 196. Great Western argues that the dispute is not arbitrable because Labors 1 and 10 are outside the contract area of the JOAs and their AMI provisions. Within these contract areas, Great Western contends, the parties have a contractual relationship, but beyond them they agreed to remain competitors.

Not all working interest owners concede that Labors 1 and 10 are outside the AMIs' contract area. The Gulf Group contends that its copy of the letter agreement did not include a map showing the area of mutual interest.[9] It acknowledges that the

9. The Gulf Group did not offer the trial court any evidence to support the contention that their copy of the letter agreement did not include a map of the area of mutual interest. This point was identified as a contention in

the demand for arbitration, which was attached as an exhibit to the working interest owners' motion to stay the litigation and compel arbitration. In light of the deferential review accorded orders compelling arbitra-

JOAs it received did contain black and white maps but contends that these had thick lines and included Labors 1 and 10 in the area of mutual interest.[10] Even if Labors 1 and 10 are outside the AMI contract area, the working interest owners collectively deny that this is dispositive.

■ Whether the Gulf Group's copy of the letter agreement included the area-of-mutual-interest map is immaterial. The letter agreement referred to the map. Thus, the Gulf Group was on notice of it. *See Westland Oil,* 637 S.W.2d 903 (Gulf and Superior were charged with notice of an operating agreement referred to in their assignment and, therefore, to a letter agreement referred to in the operating agreement). The thickness of the black line used to outline the area of mutual interest is also immaterial. The JOAs specifically stated that the outline "shall be considered a line having no width, running along the nearest boundary line of any separately surveyed section or labor appearing on said plat." Utilizing this provision and the black and white maps introduced at the trial court's hearing, it is clear that Labors 1 and 10 are outside the AMIs' contract area. The AMIs limited the interest, which an acquiring party was required to share, to interest covering lands within the area of mutual interest. Consequently, the agreements' terms would not require an acquiring party to share any interest in Labors 1 or 10.

### 4. Did the Parties Limit the Scope of the Arbitration Provision?

■ Even broad arbitration provisions have their limits. *Pennzoil Exploration,* 139 F.3d at 1067 n. 8. However, neither the parties' briefing nor our own research has revealed a case analyzing how that limit is defined when the contract contains a broad arbitration provision but also limits the duties and obligations the parties would otherwise owe one another. For the reasons articulated, we find that, when the parties specifically limit their duties and obligations, these limitations must be considered when determining the scope of their arbitration agreement.

To determine if the parties intended their arbitration provision to reach disputes over wells drilled outside the AMIs' contract area, we must examine the working interest owners contentions and contrast them with the JOAs' language. Unlike *Pennzoil Exploration* or *Dennis,* we do not have a transaction with multiple documents, only some of which include arbitration agreements. The parties' relationship is governed by the JOAs. If their dispute is within that defined relationship, the arbitration agreement applies.

We are mindful of our obligation to avoid determining the merits of the claims. *See Universal Computer Sys.,* 183 S.W.3d at 749. But, the Supreme Court in *John Wiley & Sons v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), distinguished between substantive arbitra-

---

tion, we will assume this point was adequately developed below.

10. Great Western's Appendix includes colored maps. The working interest owners object to our consideration of these maps because they were not made a part of the trial court's record. The objection is well-taken and is sustained. We have limited our consideration to the black and white maps that were included in the trial court's record. It is unclear whether the Gulf Group's maps were introduced into evidence. The maps that were introduced into evidence were exhibits to the working interest owners' demand for arbitration. The lines on these maps are not inordinately wide. The map attached to the Latigo–Strawn Prospect JOA has a line which clearly and unambiguously divides Labors 2 and 9, which are in the AMI contract area, from Labors 1 and 10, which are not.

bility, i.e., whether the dispute is encompassed by an agreement to arbitrate, and procedural arbitrability, i.e., compliance with a condition to arbitrate. Texas courts have followed this same approach. *See Teco Pipeline*, 2 S.W.3d at 583; *City of Lubbock v. Hancock*, 940 S.W.2d 123, 126 (Tex.App.-Amarillo 1996, no pet.). Accordingly, we assume the claims are meritorious, ignore any procedural challenges, and determine if the claims are within the scope of the parties' agreement.

The working interest owners allege in their arbitration statement that Great Western and Pathfinder owed fiduciary, contractual, and common law duties. They identified these as: the duty to tell the truth, the duty to keep all information acquired during the joint venture confidential, and the duty to use information bought and paid for by the joint venture only in matters that were in the best interest of the venture's members.[11] They contend these duties were violated when Great Western decided to obtain leases for, and to drill wells on, Labors 1 and 10 solely for its own benefit. Their requested relief essentially seeks a constructive trust by asking for the revenue and interest that they would have received but for Great Western's wrongful actions. Presumably, this refers to their proportionate share of the working interest, as defined by the JOAs, in the Labors 1 and 10 wells.

Regardless of whether the working interest owners are ultimately entitled to this revenue and interest, their claims are outside the scope of the arbitration clause because the JOAs specifically disclaim the duties upon which this claim must necessarily rest and the wells are beyond the

geographical boundary for the parties' obligation to share future acquisitions. Clearly, the arbitration clause has broader reach than the JOAs, and we do not read that agreement as applying only to claims arising directly under a JOA. Equally clearly, fact questions concerning the breach of duties under a JOA or questions over the existence of duties under a JOA are arbitrable claims. But, it cannot be reasonably said that—when the parties specifically defined their duties and, with regard to future acquisitions, imposed geographical and time limitations on them— they intended the arbitration clause to apply to claims clearly beyond these definitions and limitations.

 The working interest owners refer to themselves and Great Western as joint ventures. But, the JOAs specifically disclaimed any joint venture. Furthermore, the JOAs otherwise do not support the existence of a joint venture. The elements of a joint venture in Texas are (1) mutual right of control, (2) community of interest, (3) the sharing of profits as principals, and (4) the sharing of losses, costs, or expenses. *Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex.1981). The JOAs gave Great Western full control of all operations in the contract area and recognized that it was an independent contractor not subject to the control or direction of the working interest owners. *See Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316, 320 (Tex.App.-El Paso 1982, writ ref'd n.r.e.) (no joint venture because the operator had full control).

The working interest owners claim that Great Western violated its fiduciary duty, but the JOAs specifically disclaim any fidu-

---

11. In their brief, they also allege that Great Western's wells in Labors 1 and 10 were within the area of mutual interest shown on the Gulf Group's map. As noted, the Gulf Group provided the trial court with no evidence to support this contention, and the maps that were tendered by the working interest owners clearly and unambiguously indicate that Labors 1 and 10 were excluded from the area of mutual interest.

ciary duty or confidential relationship and reserve each parties' right to act on an arm's-length basis to pursue their own self-interest, "subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities *hereunder*" (emphasis added). The working interest owners seize upon this last provision to support their contention that Great Western had potential fiduciary duties to them, despite the JOAs' language to the contrary. The working interest owners' position does not take into account the difference between duties owed in connection with operations in the contract area and a broader fiduciary duty requiring Great Western to subvert its own interests in favor of the working interest owners in other property.

Texas courts have consistently held that JOAs and AMIs do not create fiduciary duties.[12] Texas courts have also consistently distinguished between duties owed in connection with lands within a JOA's contract area and with property outside the contract area. For example, in *Rankin v. Naftalis*, 557 S.W.2d 940 (Tex.1977), Rankin and his investors drilled two wells on the Melton lease. The investors contended that Rankin promised to acquire the Orsak lease for the benefit of the group. Instead, he acquired this lease in his own name and successfully drilled and completed a well on it. The court concluded that Rankin breached no duty to his investors because the obligations imposed by the parties' JOA did not extend to operations on different lands. *Id.* at 946.[13] The court cited with approval the following holding by the Kansas Supreme Court: "The fiduciary relationship created by a joint drilling venture does not forbid further acquisition and development of leases in the general area by individual venturers so long as these leases are not embraced within the scope of the enterprise or are not a natural outgrowth therefrom." *Id.* at 945 (citing *Foley v. Phillips*, 211 Kan. 735, 508 P.2d 975, 979 (1973)).

The working interest owners also allege Great Western breached its common law duties. If so, that duty is independent of the JOAs. Texas courts have refused to recognize duties inconsistent with a parties' express rights under a JOA. For example, in *Texstar N. Am. v. Ladd Petroleum Corp.*, 809 S.W.2d 672 (Tex.App.-Corpus Christi 1991, writ denied), the court refused to recognize an implied duty of mutual cooperation between working interest owners. The operator proposed fracture stimulating a well. Because that well was producing in paying quantities

12. *See, e.g., Crowder v. Tri–C Res., Inc.*, 821 S.W.2d 393, 399 (Tex.App.-Houston [1st Dist.] 1991, no writ); *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 912 (Tex.App.-Houston [1st Dist.] 1991, writ denied); *Texstar N. Am. v. Ladd Petroleum*, 809 S.W.2d 672, 678 (Tex.App.-Corpus Christi 1991, writ denied).

13. *See also Smith v. Bolin*, 153 Tex. 486, 271 S.W.2d 93 (1954) (managing partner owed fiduciary duty when he took new leases on property the partnership had leased, but not as to leases which were not included in the parties' written contract); *Warner v. Winn*, 145 Tex. 302, 197 S.W.2d 338, 342 (1946) ("The parties did not undertake to engage generally in the production and sale of gas from the Lopena field. The extent of their enterprise or joint venture was carefully defined by the contract. It contemplated and provided for the development of certain specified and carefully described areas held under certain named and well identified leases."); *McAlpin v. Sanchez*, 858 S.W.2d 501, 507–08 (Tex.App.-Corpus Christi 1993, writ denied) (the duties and rights under a JOA arise only during transactions relative to lands and leases expressly covered by the agreement and not to proposed, but unacquired, leases); *Fuqua v. Taylor*, 683 S.W.2d 735, 738 (Tex.App.-Dallas 1984, writ ref'd n.r.e.) (mere proximity is insufficient to extend a fiduciary duty from property within the scope of a fiduciary relationship to other property).

and the stimulation was considered a work over, the consent of all working interest owners was required. One working interest owner withheld its consent. The operator contended that it did so because it had other wells in the immediate area which were draining reserves that could be produced if the well was successfully stimulated. The court held the working interest owner had an absolute right to refuse to consent to the stimulation and, therefore, did not breach a duty when it did so. *Id.* at 678.

 The JOAs' good faith requirement is, by its terms, limited to the contract area. The provision does not purport to impose a duty of good faith in all dealings between the parties, but only those activities arising under the JOAs. The general rule is that operators are required to conduct their activities in good faith because they have complete control over the operations. *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 144 Tex. 475, 191 S.W.2d 716, 725 (1945). This does not, however, create a separate cause of action apart from the JOAs. *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 912 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (operator required to operate the property in good faith, but if it overcharges the working interest owners, the cause of action is for breach of contract and not for bad faith).

The working interest owners' final contention is that Great Western improperly used confidential information. The JOAs prohibited the disclosure of confidential information to third parties. They did not prohibit the use of confidential information for the parties' own purposes. The working interest owners do not contend that Great Western shared confidential information with anyone else. The record suggests that Great Western acted solely for itself when it acquired leases and drilled wells on Labors 1 and 10.

Great Western's decision to acquire leases adjacent to the area of mutual interest and its alleged statements to the working interest owners about its intentions concerning those leases may give rise to one or more causes of action, but these claims are not subject to the parties' arbitration agreement (or its damage limitation provision). The parties' agreements give rise to defined duties and obligations within the contract area and the area of mutual interest. Among these is the obligation to provide other parties an opportunity to participate in future acquisitions. No such obligation exists beyond the area of mutual interest.

The working interest owners' attorney conceded during the trial court's pretrial hearing that, if Great Western's wells had been five miles beyond the AMIs' contract area, the arbitration provision might not apply. We believe the parties designation of an area of mutual interest and their definition of the interest subject to the AMIs have more definite consequence. Because the working interest owners' claims are clearly and indisputably beyond the JOAs' defined duties and obligations, the JOAs' arbitration provisions do not apply. The trial court abused its discretion when it stayed the litigation and compelled the parties to attend arbitration. Great Western's second issue is sustained.

## V. *Holding*

The writ is conditionally granted. We are confident that the trial court will rescind its August 3, 2006 order compelling arbitration within fifteen days from the date of this opinion. Should it fail to do so, then writ of mandamus shall issue.

