Opinion filed May 14, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed May 14, 2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00154-CV 

                                                     __________

 

                                        FAWCETT,
LTD., Appellant

 

                                                             V.

 

        IDAHO NORTHERN
& PACIFIC RAILROAD COMPANY, Appellee

 



 

                                  On Appeal from the 29th District Court

                                                      Palo
Pinto County, Texas

                                                  Trial
Court Cause No. C39211

 



 

                                                                   O
P I N I O N

 








This
case involves the construction of a real estate sales contract.  Fawcett, Ltd.
(Fawcett) agreed to sell its ranch to Idaho Northern & Pacific Railroad
Company (Railroad).  Because the parties were not certain as to the exact size
of the ranch, they provided in the sales contract that either party could
terminate the contract without penalty if the actual acreage contained in the
survey turned out to vary by more than 10% (more or less) from 5,000 acres. 
The sales contract had an Exhibit A that included legal descriptions for the
ranch=s fourteen
tracts that were to be surveyed; the new survey would replace Exhibit A and be
titled Exhibit A-1.  Unfortunately, the surveyor who gave Fawcett and the
Railroad the estimate of 5,000 acres made a mistake in calculating the 5,000
acres.[1]  His
subsequent survey determined the acreage to be 5,531.6 acres.  Fawcett
terminated the contract.

The
Railroad sued Fawcett under various theories with the goal of obtaining
specific performance or partial specific performance.  Although Fawcett
contended that its termination was proper under the strict terms of the contract,
Fawcett also counterclaimed for rescission in the alternative.  Fawcett=s counterclaim was based on
the theory of a mutual mistake about the factual assumption of the ranch=s size of 5,000 acres. 
Following a bench trial, the trial court reformed the terms of the contract and
entered judgment directing Fawcett to convey to the Railroad 5,401.6 acres at
$950 per acre for $5,131,520.  To avoid the 10% termination provision, the trial
court reduced the 5,531.6 acres by subtracting the Buzbee Tract (73 acres) and
the Goundie Tract (57 acres) because it found that Fawcett did not have good
and marketable title to those tracts.  But the sales contract did not require
the survey to include only land to which Fawcett held good and marketable
title.[2]  Fawcett
appealed.  We reverse and render judgment for Fawcett.

Interpretation
of Contracts








When
construing a contract, the court=s
primary concern is to give effect to the written expression of the parties= intent.  Frost Nat=l Bank v. L & F
Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005); Ideal Lease Serv.,
Inc. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1983); In re Great
Western Drilling, Ltd., 211 S.W.3d 828, 834 (Tex. App.CEastland 2006, orig.
proceeding).  All parts of the contract are read together to ascertain the
agreement of the parties.  Frost Nat=l
Bank, 165 S.W.3d at 312; Forbau v. Aetna Life Ins. Co., 876 S.W.2d
132, 133 (Tex. 1994); Royal Indem. Co. v. Marshall, 388 S.W.2d 176,
180 (Tex. 1965).  We examine and consider the entire writing in an effort to
harmonize and give effect to all the provisions of the contract so that no
provision will be rendered meaningless.  In re Great Western, 211 S.W.3d
at 834.  The sales contract in this case is unambiguous and will be construed
as a matter of law.  See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223,
229 (Tex. 2003); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).

The
Sales Contract

The
first portion of the sales contract between Fawcett and the Railroad was a
standard Texas Real Estate Commission Farm and Ranch Contract.  The parties
attached a negotiated five-page addendum as Exhibit C.  Exhibit C included
twelve paragraphs and provided that the terms of the addendum would control if
there were any conflicting terms contained in the standard portion of their
contract.  They signed the sales contract on March 18, 2002.

Fawcett
bought the ranch without a survey in 1997 from the Waddell family.  The Waddell
family believed that the ranch contained approximately 5,500 acres.  Fawcett
then carved out a 140-acre tract and conveyed it to Roger Fawcett,
individually.  That tract was not to be included in the sale to the Railroad;
however, Paragraph 8 of Exhibit C gave the Railroad a right of first refusal if
Roger Fawcett decided to sell it later.  Roger Fawcett testified that, when he
listed the Fawcett Ranch with Jane Morgan, he told her that the acreage was
between 5,300 and 5,400 acres.  The Railroad=s
initial offer to purchase the ranch contained the figure of 5,370 acres, which
was the number of acres Fawcett used to market the ranch.  Rejecting that
initial offer, Fawcett notified the Railroad that preliminary discussions with
the surveyor indicated Aa
total of 5,000 acres %/&, instead of the 5,300 previously
thought.@  Actually,
the surveyor had calculated 4,950 acres.

Jesse
G. Lawson, a registered land surveyor, had begun a survey for Fawcett in 2001,
but stopped when an unrelated deal to sell the ranch fell through.  Fawcett and
the Railroad ultimately agreed that Lawson should finish his survey and that
they would use his survey as the conclusive expression of the acreage to be
conveyed.

Paragraph
3D of the sales contract provided that the estimated sales price of $4,750,000
(5,000 acres times $950 per acre) set forth in Paragraph 3A would be adjusted
based on the survey.  Paragraph 3D also provided a right of termination to
either party if the adjustment exceeded ten percent:








The Sales Price will
be adjusted based on the survey required by Paragraph 6B, and the number of
acres over or under  5000  acres will be multiplied by  $950.00  per
acre.  The result thereof will be added to or subtracted from the Sales Price,
and the cash amount set out in 3A will be adjusted accordingly; however, if the
amount set out in 3A is to be adjusted by more than 10%, either party may
terminate this contract and the earnest money will be refunded to Buyer.

 

In
Exhibit C, the parties agreed on how the survey would be done and that the
survey would be conclusive as to the area to be conveyed.  The addendum
provided:

2.  
The Survey to be provided pursuant to the terms of the Contract shall be staked
on the ground and show all acreage contained in the property.  Such survey
shall be a perimeter survey. . . . The acreage determined by the Survey shall
be conclusive as to the area to be conveyed for all purposes. . . .

 

3.  
The Parties agree that the metes and bounds description of the Survey shall be
substituted for the description of the Property contained in the TREC Farm and
Ranch Contract and shall become the legal description of the Property being
conveyed pursuant to the terms of the Contract.

 

Attached
as Exhibit C-1 to the sales contract is a letter dated June 22, 2001, from
Lawson to Roger Fawcett setting forth the project:

The
land survey that you requested would include the following:

 

1.  
A plat showing the boundary lines of your property as described in your deed
and as found on the ground.  The plat will show any major differences in the
location of the existing fence lines relative to the true boundary lines and it
will show existing building and major cross fences.  The plat will also show
any easements as can best be determined and it will show what was found or not
for boundary markers.

 

2.  
A written metes and bounds description will be furnished that describes the
subject property as well.

 

At the bottom of
the letter are the initials of Roger Fawcett for Fawcett and Richard D. Bertel,
president of the Railroad.  








It
is clear from Exhibit C and Exhibit C-1 that the survey was to be a perimeter
survey of the ranch that would show all the acreage contained within that
perimeter or boundary, as well as cross fences and buildings within the
perimeter.  To determine the outside perimeter and the acreage within it,
Lawson had to survey each of the tracts.  Fawcett and the Railroad signed the
contract on March 18, 2002.  At trial, they stipulated that Lawson disclosed to
them that the ranch included 5,531.6 acres in April 2002; however, neither
party contacted the other about amending the contract to correct the erroneous
5,000 acre number.  On April 26 or 27, at Bertel=s
request, Lawson gave Ralph Crouch (a surveyor/engineer for the Railroad) a copy
of the survey that Lawson had delivered to the title company on April 24. 
Crouch verified that the survey accurately reflected 5,531.6 acres. However,
the Railroad did not seek to amend the contract.  

There
are two tracts in contention that put the total acreage over the 10% limit: the
Buzbee Tract that contains 73 acres and the Goundie Tract that contains 57
acres.  Both parties agree that there are 5,531.6 acres contained within Lawson=s perimeter survey.  At
trial, two surveyors for the Railroad, David Lyons and Gerry Curtis, testified
that 5,531.6 acres appeared to be correct and that they had no reason to
believe Lawson=s
methodology was wrong.

Under
Paragraph 2 of the standard portion of the sales contract, the new survey and
legal description became Exhibit A-1 and replaced Exhibit A.  Paragraph 2 of
Exhibit C provided that the new survey Ashall
show all acreage contained in the property@
B which it did
(5,531.6 acres) B and
the acreage shown by the survey Ashall
be conclusive as to the area to be conveyed for all purposes.@       Paragraph 6 of the
standard portion of the sales contract required Fawcett to provide the survey
and a title commitment.  Paragraph 6B provided that the Railroad had seven days
to make its objections after receiving the survey and the title commitment:

Buyer will have 7
days after the receipt of the latter of the Commitment or survey to object in
writing to matters disclosed in the Commitment or survey except for those
matters specifically described in Paragraph 2.  Buyer=s failure to object under Paragraph 6 within
the time allowed will constitute a waiver of Buyer=s right to object; except that the
requirements in Schedule C of the Commitment will not be deemed to have been
waived.  Seller shall cure the timely objections of Buyer or any third party
lender within 20 days after Seller receives the objections and the Closing Date
will be extended as necessary.  If objections are not cured by the extended
Closing Date, this contract will terminate and the earnest money will be
refunded to Buyer unless Buyer elects to waive the objections.

 

The
contract does not state that the survey was to include only acreage to which
Fawcett held Agood and
marketable@ title. 
Paragraph 4a in Exhibit C was the provision that set forth Fawcett=s obligation to convey good
and marketable title at closing:

[4a.]     At
the closing, Seller will have and will convey to Buyer good and marketable
title to the subject Property by Special Warranty Deed subject only to taxes
for the current year, and any Title exceptions permitted by the terms of the
Contract (emphasis added).

 








Title exceptions
were dealt with in the quoted Paragraph 6B.  Permitted title exceptions would
include (1) title objections to a tract that were waived (e.g., the title
commitment=s exception
for the Buzbee Tract could have been waived by the Railroad) and (2) matters in
the commitment or survey that the buyer could have timely objected to but
failed to object.  The surveyor was only to determine the acreage to be
conveyed.  Among its findings, the trial court correctly stated that A[t]he surveyor did not, and
could not, make the determination as to the property to which [Fawcett] had
good and marketable title.@

Under
Paragraph 6B, the Railroad had seven days to object to any title problems
concerning the Buzbee Tract or the Goundie Tract.  The title commitment
excepted the Buzbee Tract from its insurance coverage, and the Railroad
objected to that exception.  The Railroad did not object to the title company=s commitment to include and
ensure title to the Goundie Tract.  By the terms of Paragraph 6B, Fawcett had
to cure any Buzbee Tract title problem, and if it could not be cured, the
contract would terminate unless the Railroad waived its objections.  Instead of
attempting to cure the Buzbee Tract title problem, Fawcett elected to terminate
the contract under the 10% provision in Paragraph 3D.

We
are restricted by the parties=
agreement in Paragraph 3D that A[t]he
sales price will be adjusted based on the survey required by Paragraph 6B, and
the number of acres over or under  5000  acres will be multiplied by  $950.00
 per acre. . . . [I]f the amount set out in 3A is to be adjusted by more
than 10%, either party may terminate this contract and the earnest money will
be refunded to Buyer.@ 
There is no provision in the sales contract, including its exhibits, where the
parties agreed that the survey would be reduced by acreage to which Fawcett did
not have good and marketable title.  The trial court erred in deducting the
acreage of the Buzbee Tract and the Goundie Tract from the surveyed acreage of
5,531.6 acres for purposes of the termination provision in Paragraph 3D.

Title
problems are not relevant to the termination provision in Paragraph 3D.  The
parties specifically agreed that the contract could be terminated by either
party if the final survey included  acreage that varied more than 10% from the
5,000 acres.  The Railroad did not prove that the survey was inaccurate and
stipulated that the survey included 5,531.6 acres, a variance of over ten
percent.  Every surveyor who testified at trial agreed that Lawson did the
survey correctly and that his survey included 5,531.6 acres.  Either party
could terminate the contract because of the 10% variance.








The
Buzbee Tract and the Goundie Tract

The
Railroad argues that the Buzbee Tract and the Goundie Tract should not have
been included in the survey because Fawcett had no title to either tract at the
time the contract was signed.  The Railroad reasons that the Buzbee family had
gained title by limitations and that the Goundie Tract had not been conveyed
from Waddell to Fawcett.  Fawcett=s
use of a survey that included those tracts for termination under Paragraph 3D
was, therefore, wrongful and a default under the contract.  We disagree.

The
Railroad=s premise
that Fawcett had no title to the tracts is incorrect.  The Railroad stipulated,
and the record shows, that Fawcett has had record title to the Buzbee Tract
since 1997.  Because Fawcett had record title to the Buzbee Tract, that tract
was correctly included in Lawson=s
survey; Fawcett could have conveyed his record title to the Buzbee Tract.  The
Goundie Tract was also correctly included within the perimeter survey because
it was an interior tract and Fawcett had equitable title to the Goundie Tract. 
A lack of good and marketable title to the tracts was another matter to be
dealt with as provided in Paragraph 6B of their contract.  The trial court
erred in its findings that Fawcett had no title to the two tracts.

The
Buzbee family intervened in this suit with a trespass to try title claim to the
73-acre Buzbee Tract.  The Railroad acknowledged that it was paying the legal
fees for the Buzbees.  The trial court found that the Buzbees had acquired
title by limitations.  Although that was determined  after Fawcett terminated
under Paragraph 3D, it demonstrates that Fawcett could not have cured the
Railroad=s objection
to the title commitment=s
exception to the Buzbee Tract.  Paragraph 6B provided the remedy had there been
no termination under Paragraph 3D:  the Railroad could waive its objection and
accept the record title or it could terminate the contract.

The
Railroad correctly states that the sales contract is to be interpreted as a
whole in an effort to harmonize and give effect to all its provisions so that
none will be rendered meaningless and no single provision taken alone will be
given controlling effect.  Stewman Ranch, Inc. v. Double M. Ranch, Ltd.,
192 S.W.3d 808, 810 (Tex. App.CEastland
2006, pet. denied); McMillan v. Dooley, 144 S.W.3d 159, 175 (Tex. App.CEastland 2004, pet.
denied).  We find that the provisions of this contract do not conflict and that
all provisions may be given meaning.








The
parties typed an insert in Paragraph 2 of the sales contract that the new
survey and legal description would be attached as an Exhibit A-1 that would
replace Exhibit A.  In Paragraph 2 of their Exhibit C addendum, the parties
provided that the Asurvey
shall be a perimeter survey@
and A[t]he acreage
determined by the Survey shall be conclusive as to the area to be conveyed for
all purposes.@ 
Paragraph 2 does not state that Agood
and marketable title@
to the area will be conveyed, and Fawcett could have conveyed his record title
to the Buzbee Tract.  In Paragraph 3 of Exhibit C, the parties agreed that the
metes and bounds description of the survey would be substituted for the Adescription of the Property
contained in the TREC Farm and Ranch Contract and shall become the legal
description of the Property being conveyed.@

Paragraph
6B of the sales contract provided the Railroad the remedy of terminating or
waiving its title objection to the commitment=s
exception of the Buzbee Tract, but there is no provision stating that the
Railroad could simply reduce the survey by deleting acreage with title
problems.  The Railroad=s
objection was that the title commitment should not except the Buzbee Tract from
its insurance.  The Railroad did not object to the Buzbee Tract being included
in the perimeter survey.

Paragraph
3D provided that A[t]he
Sales Price will be adjusted based on the survey required by Paragraph 6B, and
the number of acres over or under   5000   acres will be multiplied by  $950.00 
 per acre.@
Paragraph 3D then further provides that, Aif
the amount set out in 3A [$4,750,000] is to be adjusted by more than 10%,
either party may terminate this contract and the earnest money will be refunded
to Buyer.@  Again,
there is no provision that the survey would be adjusted to include only acreage
to which Fawcett had good and marketable title or that the survey would be
adjusted to exclude acreage where he lacked title.

The
parties replaced the standard default provision in Paragraph 15 of the sales
contract with their own special provision in Paragraph 11 in Exhibit C:

If Seller fails to
comply with this Contract, Seller will be in default, and Buyer=s sole and exclusive remedy
will be to either (i) enforce specific performance . . . without any warranty
of title greater than that contained in the Special Warranty Deed to be signed
by Seller and delivered to Buyer, or (ii) terminate this Contract and receive a
return of the earnest money. . . . Buyer shall not be permitted to specifically
enforce any term or condition in the Contract except to cause Seller to convey
the property by a Special Warranty Deed.








Fawcett=s holding of record title
only to the Buzbee Tract was not a default under their contract.  The parties
provided the usual method of dealing with title problems in Paragraph 6B B if Fawcett could not cure
his lack of good and marketable title to a tract, the Railroad had the option
of waiving the objection and accepting what title Fawcett could convey by
special warranty deed (record title) or simply allowing the contract to
terminate.  Had Fawcett not exercised his right to terminate, the Railroad
could have obtained specific performance requiring Fawcett to convey his record
title.  Paragraph 11 did not change the clear language of Paragraph 2 in
Exhibit C:  AThe
acreage determined by the Survey [was to] be conclusive as to the area to be conveyed
for all purposes.@ 
Thus, the survey was  conclusive as to the area in the 10% termination
provision in Paragraph 3D unless the Railroad made a successful objection to
the survey under Paragraph 6B.  But the Railroad did not object to the acreage
of either the Buzbee Tract or the Goundie Tract being included in the survey.

We
do not agree with the Railroad=s
assertion that the method of Paragraph 6B for dealing with title problems to
acreage included in the survey was not the exclusive remedy for dealing with
title issues.  The provision is a standard one in the TREC Farm and Ranch
Contract that is specifically designed to deal with title objections to acreage
being conveyed.

            The
Railroad makes three arguments concerning the Goundie Tract:  (1) the contract
did not authorize or instruct the surveyor to prepare a survey that included
the Goundie Tract because the Goundie Tract was not included in the legal
description in Exhibit A of the property to be conveyed; (2) the Railroad did
not waive objections to Fawcett having no title to the Goundie Tract because
there was nothing in Exhibit A-1 to put the Railroad on notice that the Goundie
Tract had been included; and (3) Fawcett did not have any title to the Goundie
Tract.








The
Railroad=s first
argument is that the legal descriptions in the original Exhibit A to their
contract did not include the Goundie Tract; therefore, Lawson should not have
included it in his survey.  This argument ignores the plain language of
Paragraph 2 of Exhibit C that the survey was to be a perimeter survey to show Aall acreage contained in
the property@ and that
the new survey was to be Exhibit A-1, replacing Exhibit A.  Exhibit C-1 to
their contract, the letter from Lawson to Roger Fawcett and initialed by both
parties, reflects that the parties wanted a Aplat
showing the boundary lines of [Fawcett=s]
property as described in [Fawcett=s]
deed.@  The outside
perimeter boundary lines of the ranch were described in Exhibit A, although
Lawson made corrections to them in Exhibit A-1.

Omission
of the Goundie Tract would have left a hole in the interior of the ranch.  At
trial, Lyons and Curtis (surveyors for the Railroad) testified that the survey
correctly showed 5,531.6 acres. Crouch, another surveyor for the Railroad, also
agreed that Lawson=s
survey was correctly done.  Under Paragraph 6B, the Railroad was given seven
days to make objections to the commitment or the survey.  Thus, the Railroad
had seven days to have its attorneys compare Lawson=s survey with the original description in
Exhibit A.  The Railroad then had to make an objection to the new survey or any
such objection was contractually waived.[3]

In
its second argument, the Railroad argues that it did not waive objections Ato Fawcett having no title
to the Goundie Tract@
because nothing in the commitment or survey Adisclosed@  Fawcett=s lack of title.  That is
too narrow a reading of the word Adisclosed@ in Paragraph 6B=s contractual waiver
provision.  The new Exhibit A-1 survey and survey map revealed or disclosed
that the Goundie Tract was included.  The commitment also listed the Goundie
Tract.  It was incumbent on the Railroad to examine the survey and survey map
and object to the Goundie Tract being included.  However, even if the Railroad
had objected to the Goundie Tract being included, that objection would have
contravened the parties=
agreement in Paragraph 2 of Exhibit C on how the survey was to be done.  The
Railroad=s real
problem was the termination provision in Paragraph 3D did not limit the acreage
to be conveyed to acreage to which Fawcett had good and marketable title.








The
Railroad=s third
argument B because
Fawcett had no title to the Goundie Tract, it should have been excluded from
the survey B also is
contrary to the language of the sales contract.  The survey determined the
acreage included in the perimeter of the ranch as designated by its metes and
bounds; objections to title or lack of title to any of that acreage had to be
made under Paragraph 6.  All witnesses agreed B
and the trial court found B
that a surveyor does not determine title to the land being surveyed.  Lawson
correctly followed the contract=s
provisions concerning his survey when he included the Buzbee Tract and Goundie
Tract.

Under
the terms of the contract, it does not matter whether Fawcett had any title to
the Goundie Tract when he terminated the contract relying on the terms of
Paragraph 3D; it only mattered whether the survey was done correctly.  If not,
the parties had to object to the survey under Paragraph 6B.

As
it turned out during the trial, Fawcett actually had equitable title to the
Goundie Tract.[4]  That was why
the title company was willing to insure title to the Goundie Tract and included
it in its title commitment.  When Lawson wondered why the Goundie Tract, an
interior tract, had not been included in the deed description to Fawcett
(Exhibit A), he found that a 1966 deed from E.M. Beddo and wife to Waddell had
been misfiled at Elliott & Waldron Abstract Company.  Therefore, the Beddo
deed covering the Goundie Tract was not picked up when Elliott & Waldron
closed the sale from Waddell to Fawcett in 1997, although Beddo had conveyed
title to the Goundie Tract to Waddell.  Waddell had always paid all taxes on
the Goundie Tract.  Curtis, the Railroad=s
surveyor, testified that, if he had done the survey, he would have included the
Goundie Tract Ain a
perimeter survey@ of
the ranch.  Fawcett had title, although it was not record title.  The trial
court=s findings that
Waddell and Fawcett had no title to the Goundie Tract are wrong as a matter of
law.

At
trial, Fawcett demonstrated that it could have easily corrected any title
problem to the Goundie Tract and then conveyed good and marketable title, just
as the title company had concluded by its commitment.  After the Railroad filed
its suit, Fawcett obtained a deed without warranty from Waddell to Fawcett that
covered the Goundie Tract.  Marsha Waddell Moller, Earl Waddell=s granddaughter, testified
that Waddell=s intent
in 1997 was to sell the entire ranch to Fawcett, including the Goundie Tract.








Bertel
testified that the Railroad had drafted the language about the survey being
conclusive.  In Hooks v. Cook, 345 S.W.2d 592 (Tex. Civ. App.CHouston 1961, writ ref=d n.r.e.), the contract
provided that the surveyor=s
acreage determination would be binding on both parties.  The appellate court
held that a mutual mistake, even if material, did not override the contract. 
The Railroad has attempted to distinguish this case on the ground that Lawson
did not perform the survey in accordance with the sales contract between
Fawcett and the Railroad.  But Lawson did perform his survey as their sales
contract directed.  Hooks is authority for Fawcett=s argument that Lawson=s survey was conclusive for
purposes of the 10% termination provision in Paragraph 3D, regardless of how
title questions would have been resolved under Paragraph 6.

The
Mutual Mistake

Both
parties agree that Lawson made a mistake that caused the parties to put in
5,000 acres.  The Railroad contends that their mutual mistake in writing 5,000
acres in Paragraphs 2 and 3 warranted a reformation of the contract and that
the trial court properly reformed the contract.

The
Railroad argues that the evidence in the record demonstrated that neither party
cared whether the ranch contained 5,000 acres or 5,531.6 acres, i.e., that
their agreement was for Fawcett to sell all of the acreage of the ranch at a
price of $950 per acre.  The Railroad cites to the following testimony at trial
by Roger Fawcett:

Q.        And
so if Mr. Lawson had told you 5,531.6 on the day you signed that contract, you
would have put 5,531.6 in the blank, right?

 

A.        That is right.

 

In support of
its argument, the Railroad cites Cherokee Water Co. v. Forderhause, 741
S.W.2d 377, 379 (Tex. 1987), where the supreme court stated that Areformation requires two
elements:  (1) an original agreement and (2) a mutual mistake, made after
the original agreement, in reducing the original agreement to writing.@  There must be an actual
agreement that was reached prior to the drafting of the instrument involved.  Id.
at 379.








It
does not appear from the record that the parties had reached an agreement
before their mutual mistake in writing in the number of 5,000 acres.  The
Railroad first offered $865 an acre for 5,370 acres as opposed to the asking
price of $1,050.  In rejecting that offer, Roger Fawcett faxed Bertel noting
that A[p]reliminary
discussions with the surveyor are indicating a total of 5,000 acres %/&,
instead of the 5,300 previously thought@
and attached a $975 per acre counteroffer.  Then on March 4, Bertel faxed
Fawcett a counteroffer of $945 per acre for 5,000 acres with the offered
purchase price of $4,725,000 to be adjusted at closing by the final acreage
determined by the new survey.  The parties stipulated that on March 13 there
was an e-mail from the Railroad=s
lawyer proposing a rewrite of a paragraph.  At one point, Bertel agreed that he
and Fawcett had relied on Lawson=s
estimate before they signed the contract.  The sales contract was signed on
March 18, 2002.

Roger
Fawcett=s statement
was only an acknowledgment that he was relying on Lawson to provide the base
number for Paragraph 3D at the time they entered the contract.  It is not
evidence that the parties had reached an agreement on 5,531.6 acres as a base
before the mutual mistake was made.  There is no evidence in the record to
support the trial court=s
finding that the parties had reached an agreement before their mutual mistake. 
Reformation, an equitable remedy, was not available to the Railroad under the
facts of this case.  Equity cannot be invoked to create a contract that the
court considers should have been made but was not.  Ulhorn v. Reid, 398
S.W.2d 169, 175 (Tex. Civ. App.CSan
Antonio 1965, writ ref=d
n.r.e.).  To obtain reformation, the Railroad had to prove the true agreement
of the parties; it was not enough to show that both parties were mistaken about
some feature of their bargain.  Nat=l
Resort Cmtys., Inc. v. Cain, 526 S.W.2d 510, 513 (Tex. 1975).  Although the
surveyor gave an erroneous estimate, the record reflects that the parties used
that figure when they agreed on a sales price and set a base number of acres
for the termination provision.








Paragraph
3D was material to the transaction.  A 10% variance meant an adjustment of over
$500,000 to the estimated price of $4,750,000.  From the terms of Paragraph 3D,
the parties obviously considered the 10% provision material at the time they
entered into the contract.  One would normally think of Paragraph 3D as
protecting the buyer if the purchase price was going to exceed 10% of the
estimated purchase price and protecting the seller if the purchase price was
going to be less than 90% of the estimated purchase price.  For example, assume
that the Railroad only had a financing commitment that was limited to no more
than 10% above the estimated price.  Paragraph 3D gave the Railroad an
automatic way to terminate the contract.  Fawcett, on the other hand, had a way
to terminate the contract if he was going to be paid an amount that would be
less than 10% of the estimated purchase price and needed (or simply wanted) an
amount closer to the estimated purchase price.  Here, however, Fawcett
terminated under Paragraph 3D even though he was going to receive more for the
ranch than anticipated.  Under the terms of Paragraph 3D, he was permitted to
do so.

We
need not consider whether to grant rescission to Fawcett.  By the terms of their
contract, he was entitled to terminate their sales contract under the
provisions of Paragraph 3D.

Other
Equitable Theories

We
also find that there is no evidence to support the trial court=s findings that Fawcett
could not terminate the contract under Paragraph 3D because of estoppel,
unclean hands, waiver, and laches.  The record reflects that, until Fawcett
terminated the contract on May 13, both parties took only steps that were
consistent with performing under the contract.  The Railroad has not pointed
this court to any evidence that would demonstrate some sort of detrimental
reliance on a contract modification. At trial, the Railroad referred to a
telephone call from Roger Fawcett to Jane Morgan, the broker, to support a
theory that Fawcett had ratified a modification to the contract that
Paragraph 3D would be ignored. That testimony by Fawcett, Morgan, and
Bertel was at best ambiguous.  When asked if he called Morgan when the number
of acres came back at 5,531.6 acres, Fawcett answered, AI don=t
know.@  Roger Fawcett
was then asked if he told Morgan to call Bertel to see Aif he was going to stay hitched.@  He answered, AI vaguely remember talking
to her about it somehow.@

Morgan
testified that there was some correspondence that indicated that Fawcett asked
her to call and see if Bertel Awould
stay hitched,@ but she
did not recall the actual conversation.  She also said that the correspondence
led her to believe that she did follow up Abecause
[she did] know that [Bertel] still wanted to buy it and [Fawcett] still wanted
to sell it.@

Bertel
testified that, after he received information about the increase to 5,531.6
acres, he heard from Morgan.  Morgan said that, in view of the dramatic
increase in acreage, she Awanted
to assure herself, and I believe Mr. Fawcett, that [Bertel] was still
interested in going forward.@ 
Bertel said he told Morgan that he was.  Morgan testified that it was more land
than anyone thought and that every indication from Bertel was that he still
wanted to buy the ranch, Aif
[Fawcett] still wanted to sell it to him.@








Fawcett
further testified that he ultimately found out that Bertel wanted to go ahead
with the sale.  He was asked whether he was concerned when the number came back
that the Railroad might get out of the contract.  Fawcett=s response was as follows:

I wouldn=t call it concerned.  I didn=t give it a lot of
thought.  If he wanted to stay, he could; and if he wanted to leave, he could. 
I mean, that was the contract.  He had all kinds of outs on that contract.

 

The evidence
referred to does not support the equitable theories found by the trial court. 
The Railroad has not pointed us to other evidence in the record to support
those equitable theories.

Nor
has the Railroad provided us with argument and record citations to support the
trial court=s finding
that A[Fawcett] waived
its right to terminate the contract@
or that Fawcett was barred by laches or had unclean hands.  Waiver consists of
full knowledge of a known right (such as the parties= rights under Paragraph 3D) and intentional
conduct inconsistent with claiming that known right.  See EZ Pawn Corp. v.
Mancias, 934 S.W.2d 87, 89 (Tex. 1996); U.S. Fid. & Guar. Co. v.
Bimco Iron & Metal Corp., 464 S.W.2d 353, 357 (Tex. 1971).  Laches
requires an unreasonable delay in asserting a right and a detrimental change in
position by the other party.  City of Fort Worth v. Johnson,
388 S.W.2d 400, 403 (Tex. 1964).  We have found no evidence in the record
supporting a finding of an unreasonable delay by Fawcett in exercising his
right of termination under Paragraph 3D, nor has the Railroad provided us
with that evidence.

We
have found no evidence to support the trial court=s
finding that Fawcett could not terminate the contract because of unclean
hands.  That concept involves the denial of relief to a litigant whose conduct
has been unconscientious or unjust or violates the principles of equity and
fair dealing.  Crown Constr. Co. v. Huddleston, 961 S.W.2d 552, 559
(Tex. App.CSan Antonio
1997, no pet.).  There was evidence in the record that, just before Fawcett
terminated the contract, he received a faxed higher offer for the ranch on May
13.  However, the contract expressly stated in Paragraph 6C(7) that, unless
expressly prohibited in writing by the parties, Fawcett could continue to show
the ranch for sale Aand
to receive, negotiate and accept back-up offers.@








There
also was evidence that there was a meeting on May 7 attended by Fawcett,
Bertel, and James Lattimore, who represented Allied Waste, a landfill company. 
It appears that Fawcett had been negotiating with Lattimore to receive a
payment and property improvements in exchange for dropping his opposition to a
proposed landfill near the ranch.  Bertel had also been discussing matters with
Allied.  The record reflects that Fawcett and Bertel disagreed over whether the
Railroad would share in any payment from Allied.  We do not find that evidence
sufficient to support a finding that Fawcett acted with unclean hands.

Summary

Paragraph
2 of the contract described the property as 5,000 acres, more or less. 
Paragraph 3D used 5,000 acres to calculate the estimated price of the
ranch as 5,000 acres times $950 per acre or $4,750,000.  Paragraph 3D also
provided a termination right to either party if the final survey required by
Paragraph 6B resulted in a variance of more than 10% when the acres contained
in the survey were multiplied by $950 per acre.  The parties agreed in Paragraph
2 of Exhibit C that the survey would be a perimeter survey and that the acreage
determined by the survey would be conclusive as to the area to be conveyed.  In
surveying the ranch, the surveyor correctly followed the instructions in
Exhibits C and C-1 of the contract.

Under
Paragraph 6B, the Railroad had seven days to object to any title commitment
exceptions or problems with the survey.  This included any objections to title
problems concerning the Buzbee Tract or the Goundie Tract or to those tracts
being included within the survey.  The title commitment excepted the Buzbee
Tract from its insurance coverage, and the Railroad objected to that
exception.  The Railroad did not object to the title company=s commitment to include and
ensure title to the Goundie Tract.  By the terms of Paragraph 6B, Fawcett had
to cure any Buzbee Tract title problem and, if it could not be cured, the
contract would terminate unless the Railroad waived its objections.








Paragraph
2 of Exhibit C does not require that the survey was to only include acreage to
which Fawcett had good and marketable title.  Paragraph 4a in Exhibit C
required Fawcett to convey good and marketable title at closing Asubject only to taxes for
the current year, and any Title exceptions permitted by the terms of the
Contract.@  Title
exceptions permitted by the contract included (1) the title exception to
insurance coverage of the title to the Buzbee Tract to which the Railroad
objected and (2) the inclusion of the Goundie Tract within the survey to which
the Railroad failed to object within the seven days as required by Paragraph
6B.  Had Fawcett not terminated the contract under the provisions of Paragraph
3D, the Railroad=s
remedy if Fawcett could not cure the title problem to the Buzbee Tract would
have been (1) to waive its objection and accept a special warranty deed
conveying only Fawcett=s
record title or (2) to terminate the contract.  Had the Railroad objected to
the inclusion of the Goundie Tract within the perimeter survey, Fawcett would
have had an opportunity to clear up the title problem.  Assuming that before
closing the Railroad had not terminated the contract because of Fawcett=s holding only record title
to the Buzbee Tract, both tracts would have been included in the final
calculation of the purchase price.  That purchase price would have varied more
than 10% from the initial estimated price.

Title
problems were not relevant to the termination provision in Paragraph 3D.  The
Railroad did not prove that the survey was inaccurate.  The survey included 5,531.6
acres and resulted in a variance of more than 10% under Paragraph 3D.  Either
party could have terminated the contract.

This
Court=s Ruling

The
judgment of the trial court is reversed, and judgment is rendered for Fawcett.

 

 

TERRY McCALL

JUSTICE

 

May 14, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.

 









[1]Paragraph 2 defines the AProperty@ as A5000 acres,
more or less,@ with the legal descriptions attached as Exhibit A. 
If the parties had added the acreage described in the fourteen tracts in
Exhibit A, they would have easily determined that the tracts appeared to
contain 5,676.6 acres, not 5,000 acres.  Thus, the final survey of 5,531.6
acres did not vary from the initial legal descriptions in Exhibit A by more
than 10%.  However, the parties agreed on 5,000 acres as the base number in
Paragraph 3.





[2]If Fawcett did not or could not cure an objection by
the Railroad that Fawcett did not have good and marketable title to a specific
tract, the contract provided that the Railroad had the option of terminating
the contract or waiving the title exceptions. 





[3]The Railroad cites several cases for the proposition
that it did not intentionally waive any of its rights: U.S.Fid. &
Guar. Co. v. Bimco Iron & Metal Corp., 464 S.W.2d 353, 357 (Tex. 1971);
EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex. 1996); and Guzman
v. Ugly Duckling Car Sales of Tex., L.L.P., 63 S.W.3d 522, 528 (Tex. App.CSan Antonio 2001, pet. denied).  The cases are
inapposite.  Here, the waiver involved is a contractual waiver under Paragraph
6 that does not require a showing of intent.  These cases would only be
applicable to an argument by the Railroad that Fawcett by conduct had waived
the Railroad=s failure to object under Paragraph 6.





[4]The record reflects that Fawcett had title by the
concept of strips and gores.  The 57-acre tract was small in comparison to the
total acreage of the ranch, it was surrounded by the land conveyed to Fawcett,
it belonged to Waddell at the time of conveyance to Fawcett, and the tract was
insignificant.  Glover v. Union Pac. R.R. Co., 187 S.W.3d 201, 212 (Tex.
App.CTexarkana 2006, pet. denied).  We again emphasize that
Fawcett was not required to prove that it had title to the Goundie Tract.  The
Railroad failed to object to its inclusion in the survey.