NATIONAL RESORT COMMUNITIES, INC.,
Petitioner,

v.

Kenneth L. CAIN et al., Respondents.

No. B–4868.

Supreme Court of Texas.

May 28, 1975.

Rehearing Denied July 9, 1975.

Clark, Thomas, Denius, Winters & Shapiro, Barry K. Bishop, Austin, for petitioner.

Stayton, Maloney, Hearne, Babb & Cowden, Douglass D. Hearne, Austin, for respondent.

REAVLEY, Justice.

The purchasers of lots in a lake subdivision are seeking to reform the lot descriptions in their contracts of sale on the ground of mutual mistake. The trial court reformed the contracts to meet the prayer of the purchasers, and the Court of Civil Appeals affirmed. 512 S.W.2d 367. We hold that the mistake of the parties to the contracts cannot be rectified by reformation because of the absence of any agreement by the parties at the time of making the contracts that the writing would bind them to the transfer of the particular land purchasers now seek to obtain.

Between March and July of 1969 these five purchasers selected areas which they desired to purchase in the Lago Vista subdivision on Lake Travis. The surveying of the roads and lots was not completed until July. The purchaser and the subdivision sales agent agreed that the former would have the option of purchasing lots which would extend on the west to the former bed of the Colorado River, which meant that the lots would always reach into the water of this inconstant level lake. When the surveying was done, however, the west boundary of the lots was placed along the 715 foot elevation, the contour line to which the Lower Colorado River Authority had a flowage easement. This put the lots allocated to these purchasers away from the edge of the water. Since July of 1969 the seller has been willing to rescind all of the transactions, and it offered to execute contracts for certain lots as subdivided and platted nearest the water, but the seller has refused to contract for the sale of land between the 715 foot contour line and the old river. The difference being critical to the purchasers, who wanted and agreed with the selling agent that they were to get waterfront land, this litigation resulted.

The purchasers first sued the seller to enforce the promises of its agent and to obtain specific performance of the lot selected by each purchaser and extending to the bed of the old river. That effort fell unsuccessful on the horns of the statute of frauds. National Resort Communities, Inc. v. Cain, 479 S.W.2d 341 (Tex.Civ.App. 1972, writ ref'd n. r. e.). The Court of Civil Appeals then remanded in the interest of justice to permit the purchasers to prove, if that were the case, that the parties were mutually mistaken in a belief that the descriptions of the property used in the contracts were sufficient to identify the land between the platted lots and the old river channel. The purchasers applied for writ of error in this Court, contending unsuccessfully that they were entitled to the judgment of specific performance as rendered by the trial court. The seller did not apply for writ of error and accepted the remand.

Back in the trial court, the purchasers amended their pleadings to seek reformation of the contracts and contended that the parties were mutually mistaken in the belief that the descriptions were sufficient to bind them to the transfer of the waterfront property. A summary of the evidence of the transaction with each of the purchasers follows.

*Kenneth Cain*

Cain was the one who discovered this attractive land and who told the other purchasers. He was at the Lago Vista lake resort in March of 1969 when he met and spoke of his interest in acquiring lakefront property with the Lago Vista salesman, T. M. Irvin. Irvin told him that Lago Vista had just acquired a new tract and that lakefront lots would be available. This new tract contained 776 acres and in March there were no improved roads into

the area; Cain and Irvin rode in a jeep and walked over the land to inspect it. Cain selected an area of the lakefrontage that he desired to purchase and one stake was placed to designate that area. No surveying had been done within the 776 acres; so Cain and Irvin agreed that when the lot lines were located, an adjustment would be made if necessary to give Cain the lakefrontage he desired. There is no dispute but that the two agreed that the land to be conveyed would extend into the lake and to the old river bed.

On March 18, 1969 a contract with the seller was executed by Cain. It consisted of a complete contract for lot 408 which was located in an older section of Lago Vista. The parties also signed a sales deposit receipt which provided under "other terms and conditions" the following:

> Buyer herein may transfer equity to stake parcel in new area for 6500 total purchase price lakefront at least 100 × 125.

Thereafter Cain received a letter from the seller, confirming the March 18 contract and saying in part:

> This letter will confirm that you have the option to trade your equity in said lot toward the purchase of a lot on the lakefront as near as possible to the location of a stake with your name thereon. Said lot shall be a minimum of 100 feet by 125 feet with a purchase price of $6,500.00.

Lago Vista filed with the County Clerk a subdivision plat of its "Country Club Estates, Section Five" on July 15, 1969. All of the lots in the area of controversy have the 715 foot contour line as their western boundaries. Prior to the trial of this cause, Cain and his fellow purchasers employed a surveyor to extend the north and south lines of certain lots westwardly toward the lake. By this means they obtained fieldnotes which described lakefrontage matching the area originally desired by each purchaser. These fieldnotes were used by the trial court in its judgment reforming the contracts in accord with the contentions of the purchasers. The contract for Cain was thus reformed to describe lot 776 as shown on the Lago Vista plat but extended on west to the old Colorado River bed.

### Donald Yarbrough

Yarbrough desired lakefront next to Cain, and the agreement and transaction were to the same effect in all material respects. On March 27, 1969, Yarbrough signed a contract for platted lot 607 as well as a sales deposit receipt which stated:

> Customer has option to exchange this lot on lot where stake on new section of Country Club. Waterfront price $6,500—100 × 125 at least.

The contract for Yarbrough was reformed by the trial court to describe lot 777 as shown on the Lago Vista plat but extended on west to the river bed.

### Irene Yarbrough

Donald Yarbrough selected an adjoining site for his mother, Irene Yarbrough. Her contract to purchase lot 426 is dated April 2, 1969. At the bottom of that contract is written: "Customer has option to exchange for waterfront lot in new section CC." On the sales deposit receipt is written:

> Customer has option to exchange this lot for waterfront lot in new section Country Club at $6500. 100 × 125 above the waterline 715.

Her contract was reformed by the trial court to describe lot 778 as shown on the Lago Vista plat but extended on west to the river bed.

### Richard Young

By June 15 when Young made his agreement and signed the contract, some surveying had been done and a plat was available, although the work was not completed. Young was interested in two areas, each composing two lots. He signed contracts to purchase lots 755 and 757, and on his sales deposit receipts is written: "Customer has option on 772 and 773 at same price."

At that time Irvin and Young were not certain of the numbers of the lots which Young wanted, and which they named in

the receipts as 772 and 773. They had an agreement as to the lots on the ground but were to adjust the description to 771 and 772 if those were the correct lot numbers (as was later determined to be so).

As to the west line of lots 771 and 772, the stakes on the ground were at the 715 contour line, and there had been no surveying or any line located on the ground further west between that 715 level and the lake or river bed. This was also shown on the plat. These lots were bounded on the west by the 715 foot line and did not extend to the river bed. The seller's agent, Irvin, assured Young nevertheless that the surveying was incomplete and that these lots would be extended west to the river bed.

### Paul Nelson

Nelson signed his contract for lot 775 on June 25. He, like Young, saw the plat which placed the west boundary at the 715 foot contour line, but he was told that the final survey would locate that line at the river bed.

There is no contention that Irvin was dishonest in what he told these purchasers. He testified at the trial that the testimony of the purchasers was correct and that he agreed that all of them would get lots extending to the river bed. He is still selling lots in this subdivision. Apparently his superiors changed their plans or he had misunderstood them. We assume for purposes of this opinion that the officers of the corporation which owned the land were aware of the oral agreement between Irvin and the purchasers and that any mistake of Irvin was the mistake of the corporate officers.

The trial court asked the jury to answer special issues for each of the five purchasers. For Kenneth Cain, Donald Yarbrough, and Irene Yarbrough, the issues inquired whether the parties "were mutually mistaken in the belief that the descriptions used in the sales contracts were sufficient to describe a particular and identified lot which would be at least 100 × 125 feet above the 715-foot contour line and extending westerly into the lake to the channel of the old river?" The issue pertaining to Richard Young inquired if the parties "were mutually mistaken in the belief that the descriptions used in the sales contracts were sufficient to describe lots Nos. 771 and 772 and the extensions thereof westerly into the lake to the channel of the old river." The issue relative to Paul Nelson made the same inquiry as that of Richard Young, except that Nelson's question was whether the contract was "sufficient to describe Lot No. 775 and the extensions thereof westerly into the lake to the channel of the old river?" The jury answered all of these issues in favor of the purchasers and the trial court entered judgment reforming the contracts to describe tracts of land by metes and bounds which placed the west boundaries at the river bed. The Court of Civil Appeals affirmed, thinking that the result was in accord with Morrow v. Shotwell, 477 S.W.2d 538 (Tex.1972).

The statute of frauds, V.T.C.A., Bus. & C., § 26.01, is no bar to the reformation of a contract for the sale of land where the parties had an agreement and by their mutual mistake failed to state the agreement in the writing. The one who seeks to have equity change the writing must satisfy two requirements. First, he must prove the true agreement of the parties, for it is not enough to show that both parties were mistaken about some feature of their bargain. Mistakes of that nature may warrant rescission but not reformation. For example, in Continental Oil Co. v. Doornbos, 402 S.W.2d 879 (Tex.1966), the grantor and grantee both thought that the grantor owned all of the mineral estate except $\frac{3}{32}$ royalty interest and that after reserving another $\frac{1}{32}$ royalty to the grantor, the grantee would then be entitled to all royalty above an eighth of production if provided by any subsequent lease. They were mistaken; the effect of a prior deed entitled the prior grantee to take $\frac{1}{4}$ of all royalty, regardless of whether the lease paid $\frac{1}{8}$ or more. There was a mistake, but there was no agreement to substitute for that of the written conveyance.

The second requirement for reformation is that the provision erroneous...

written (or included or omitted) into the instrument was there by mutual mistake. It is not enough that the writing differed from the oral agreement. Estes v. Republic National Bank of Dallas, 462 S.W.2d 273 (Tex.1970); Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447 (1935). "The province of reformation is to make a writing express the bargain which the parties desired to put in writing." 13 Williston on Contracts § 1549 (3rd ed. 1970).

These requirements were both met by the purchaser in Shotwell v. Morrow, 498 S.W.2d 432 (Tex.Civ.App.1973, writ ref'd n. r. e.). Both seller and purchaser had identified all four corners and boundary lines prior to the time they signed the contract, and they both thought that the description in the deed was legally sufficient to describe that very tract. The trial judge shared their mistake on that score when the case was first heard on the purchaser's attempt to obtain specific performance of the contract as written. In the first phase of the case, the Supreme Court held the description to be inadequate, but remanded the case for this reason:

> There is in the record strong evidence that the parties intended to describe a particular and identified tract of 12.375 in their contract, and that they were mutually mistaken in the belief that the description used was legally sufficient for that purpose. If that be a fact, Morrow would have been entitled to reformation of the contract had he sought it. Morrow v. Shotwell, 477 S.W.2d 538, 541 (Tex.1972).

Following the second trial, where the purchaser's evidence and the findings met these requirements stated by the Supreme Court, the second appeal by the seller was correctly disposed of by the Court of Civil Appeals with the explanation that no mistake had been made in the identity of the property itself, but the mutual mistake was made in the misdescription in the written contract. 498 S.W.2d 432, 434.

■■ The answer to the suit of Cain et al. is that no precise land beyond the 715 foot contour line was ever identified by the parties. They agreed upon a general area or site. This neither satisfies the express requirements for reformation stated in Morrow v. Shotwell, nor would it satisfy the statute of frauds if the contract were reformed to that effect. A tract of land is not identified for these purposes by the location of a single stake and the agreement to adjust future plat lines to include a certain point or stand of trees.

Three of the purchasers signed contracts at a time when no corner or boundary line was known. The other two were definite only about the lot lines above the 715 foot elevation; there was no agreement that the north and south lines would be extended due west or on the very same bearing as the existing line (straight from the road to the river bed) or that the purchaser himself was to elect exactly how to extend the lines westerly. The acreage below the 715 foot elevation was *to be located* after all of the written contracts were signed. The surveyor subsequently employed by the purchasers did more than produce descriptive fieldnotes for the trial court's judgment; he located the lines below the 715 foot elevation for the first time.

■ Surely these parties were mutually mistaken. They thought that, when the surveying was completed, lots in this area would extend to the old river bed. Perhaps they were mistaken about the law, thinking that the oral agreements could be enforced and that equity would complete the surveying and locate lot lines in substantial accord with those agreements. These mistakes are no basis for reformation. The parties had no agreement for the sale of tracts with specifically defined boundaries and they could not have thought that the recitations on the sales deposit receipts described tracts so "particular and identified."

■ The seller has stood ready throughout this litigation to rescind the contracts. The cause will therefore be remanded to the trial court to allow each purchaser to obtain rescission or to stand upon his contract as written.

The judgments of the courts below are reversed and the cause is remanded to the trial court.

SAM D. JOHNSON, J., notes his dissent.