**Opinion filed May 14, 2009**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-07-00154-CV**

_____

**FAWCETT, LTD., Appellant**

**V.**

**IDAHO NORTHERN & PACIFIC RAILROAD COMPANY, Appellee**

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. C39211**

**O P I N I O N**

This case involves the construction of a real estate sales contract. Fawcett, Ltd. (Fawcett) agreed to sell its ranch to Idaho Northern & Pacific Railroad Company (Railroad). Because the parties were not certain as to the exact size of the ranch, they provided in the sales contract that either party could terminate the contract without penalty if the actual acreage contained in the survey turned out to vary by more than 10% (more or less) from 5,000 acres. The sales contract had an Exhibit A that included legal descriptions for the ranch's fourteen tracts that were to be surveyed; the new survey would replace Exhibit A and be titled Exhibit A-1. Unfortunately, the surveyor who gave

Fawcett and the Railroad the estimate of 5,000 acres made a mistake in calculating the 5,000 acres.[1] His subsequent survey determined the acreage to be 5,531.6 acres. Fawcett terminated the contract.

The Railroad sued Fawcett under various theories with the goal of obtaining specific performance or partial specific performance. Although Fawcett contended that its termination was proper under the strict terms of the contract, Fawcett also counterclaimed for rescission in the alternative. Fawcett's counterclaim was based on the theory of a mutual mistake about the factual assumption of the ranch's size of 5,000 acres. Following a bench trial, the trial court reformed the terms of the contract and entered judgment directing Fawcett to convey to the Railroad 5,401.6 acres at $950 per acre for $5,131,520. To avoid the 10% termination provision, the trial court reduced the 5,531.6 acres by subtracting the Buzbee Tract (73 acres) and the Goundie Tract (57 acres) because it found that Fawcett did not have good and marketable title to those tracts. But the sales contract did not require the survey to include only land to which Fawcett held good and marketable title.[2] Fawcett appealed. We reverse and render judgment for Fawcett.

*Interpretation of Contracts*

When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005); *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983); *In re Great Western Drilling, Ltd.*, 211 S.W.3d 828, 834 (Tex. App.—Eastland 2006, orig. proceeding). All parts of the contract are read together to ascertain the agreement of the parties. *Frost Nat'l Bank*, 165 S.W.3d at 312; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994); *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 180 (Tex. 1965). We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that no provision will be rendered meaningless. *In re Great Western,* 211 S.W.3d at 834. The sales contract in this case

---

[1]Paragraph 2 defines the "Property" as "5000 acres, more or less," with the legal descriptions attached as Exhibit A. If the parties had added the acreage described in the fourteen tracts in Exhibit A, they would have easily determined that the tracts appeared to contain 5,676.6 acres, not 5,000 acres. Thus, the final survey of 5,531.6 acres did not vary from the initial legal descriptions in Exhibit A by more than 10%. However, the parties agreed on 5,000 acres as the base number in Paragraph 3.

[2]If Fawcett did not or could not cure an objection by the Railroad that Fawcett did not have good and marketable title to a specific tract, the contract provided that the Railroad had the option of terminating the contract or waiving the title exceptions.

is unambiguous and will be construed as a matter of law.  *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

*The Sales Contract*

The first portion of the sales contract between Fawcett and the Railroad was a standard Texas Real Estate Commission Farm and Ranch Contract.  The parties attached a negotiated five-page addendum as Exhibit C.  Exhibit C included twelve paragraphs and provided that the terms of the addendum would control if there were any conflicting terms contained in the standard portion of their contract.  They signed the sales contract on March 18, 2002.

Fawcett bought the ranch without a survey in 1997 from the Waddell family.  The Waddell family believed that the ranch contained approximately 5,500 acres.  Fawcett then carved out a 140-acre tract and conveyed it to Roger Fawcett, individually.  That tract was not to be included in the sale to the Railroad; however, Paragraph 8 of Exhibit C gave the Railroad a right of first refusal if Roger Fawcett decided to sell it later.  Roger Fawcett testified that, when he listed the Fawcett Ranch with Jane Morgan, he told her that the acreage was between 5,300 and 5,400 acres.  The Railroad's initial offer to purchase the ranch contained the figure of 5,370 acres, which was the number of acres Fawcett used to market the ranch.  Rejecting that initial offer, Fawcett notified the Railroad that preliminary discussions with the surveyor indicated "a total of 5,000 acres +/−, instead of the 5,300 previously thought."  Actually, the surveyor had calculated 4,950 acres.

Jesse G. Lawson, a registered land surveyor, had begun a survey for Fawcett in 2001, but stopped when an unrelated deal to sell the ranch fell through.  Fawcett and the Railroad ultimately agreed that Lawson should finish his survey and that they would use his survey as the conclusive expression of the acreage to be conveyed.

Paragraph 3D of the sales contract provided that the estimated sales price of $4,750,000 (5,000 acres times $950 per acre) set forth in Paragraph 3A would be adjusted based on the survey.  Paragraph 3D also provided a right of termination to either party if the adjustment exceeded ten percent:

> The Sales Price will be adjusted based on the survey required by Paragraph 6B, and the number of acres over or under  5000  acres will be multiplied by  $950.00  per acre.  The result thereof will be added to or subtracted from the Sales Price, and the cash amount set out in 3A will be adjusted accordingly; however, if the amount set

3

out in 3A is to be adjusted by more than 10%, either party may terminate this contract and the earnest money will be refunded to Buyer.

In Exhibit C, the parties agreed on how the survey would be done and that the survey would be conclusive as to the area to be conveyed. The addendum provided:

> 2. The Survey to be provided pursuant to the terms of the Contract shall be staked on the ground and show all acreage contained in the property. Such survey shall be a perimeter survey. . . . The acreage determined by the Survey shall be conclusive as to the area to be conveyed for all purposes. . . .

> 3. The Parties agree that the metes and bounds description of the Survey shall be substituted for the description of the Property contained in the TREC Farm and Ranch Contract and shall become the legal description of the Property being conveyed pursuant to the terms of the Contract.

Attached as Exhibit C-1 to the sales contract is a letter dated June 22, 2001, from Lawson to Roger Fawcett setting forth the project:

> The land survey that you requested would include the following:

> 1. A plat showing the boundary lines of your property as described in your deed and as found on the ground. The plat will show any major differences in the location of the existing fence lines relative to the true boundary lines and it will show existing building and major cross fences. The plat will also show any easements as can best be determined and it will show what was found or not for boundary markers.

> 2. A written metes and bounds description will be furnished that describes the subject property as well.

At the bottom of the letter are the initials of Roger Fawcett for Fawcett and Richard D. Bertel, president of the Railroad.

It is clear from Exhibit C and Exhibit C-1 that the survey was to be a perimeter survey of the ranch that would show all the acreage contained within that perimeter or boundary, as well as cross fences and buildings within the perimeter. To determine the outside perimeter and the acreage within it, Lawson had to survey each of the tracts. Fawcett and the Railroad signed the contract on March 18, 2002. At trial, they stipulated that Lawson disclosed to them that the ranch included 5,531.6 acres in April 2002; however, neither party contacted the other about amending the contract to correct the erroneous 5,000 acre number. On April 26 or 27, at Bertel's request, Lawson gave

4

Ralph Crouch (a surveyor/engineer for the Railroad) a copy of the survey that Lawson had delivered to the title company on April 24. Crouch verified that the survey accurately reflected 5,531.6 acres. However, the Railroad did not seek to amend the contract.

There are two tracts in contention that put the total acreage over the 10% limit: the Buzbee Tract that contains 73 acres and the Goundie Tract that contains 57 acres. Both parties agree that there are 5,531.6 acres contained within Lawson's perimeter survey. At trial, two surveyors for the Railroad, David Lyons and Gerry Curtis, testified that 5,531.6 acres appeared to be correct and that they had no reason to believe Lawson's methodology was wrong.

Under Paragraph 2 of the standard portion of the sales contract, the new survey and legal description became Exhibit A-1 and replaced Exhibit A. Paragraph 2 of Exhibit C provided that the new survey "shall show all acreage contained in the property" – which it did (5,531.6 acres) – and the acreage shown by the survey "shall be conclusive as to the area to be conveyed for all purposes."

Paragraph 6 of the standard portion of the sales contract required Fawcett to provide the survey and a title commitment. Paragraph 6B provided that the Railroad had seven days to make its objections after receiving the survey and the title commitment:

> Buyer will have 7 days after the receipt of the latter of the Commitment or survey to object in writing to matters disclosed in the Commitment or survey except for those matters specifically described in Paragraph 2. Buyer's failure to object under Paragraph 6 within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment will not be deemed to have been waived. Seller shall cure the timely objections of Buyer or any third party lender within 20 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured by the extended Closing Date, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer elects to waive the objections.

The contract does not state that the survey was to include only acreage to which Fawcett held "good and marketable" title. Paragraph 4a in Exhibit C was the provision that set forth Fawcett's obligation to convey good and marketable title at closing:

> [4a.]    At the closing, Seller will have and will convey to Buyer good and marketable title to the subject Property by Special Warranty Deed subject only to taxes for the current year, *and any Title exceptions permitted by the terms of the Contract* (emphasis added).

Title exceptions were dealt with in the quoted Paragraph 6B. Permitted title exceptions would include (1) title objections to a tract that were waived (e.g., the title commitment's exception for the Buzbee Tract could have been waived by the Railroad) and (2) matters in the commitment or survey that the buyer could have timely objected to but failed to object. The surveyor was only to determine the acreage to be conveyed. Among its findings, the trial court correctly stated that "[t]he surveyor did not, and could not, make the determination as to the property to which [Fawcett] had good and marketable title."

Under Paragraph 6B, the Railroad had seven days to object to any title problems concerning the Buzbee Tract or the Goundie Tract. The title commitment excepted the Buzbee Tract from its insurance coverage, and the Railroad objected to that exception. The Railroad did not object to the title company's commitment to include and ensure title to the Goundie Tract. By the terms of Paragraph 6B, Fawcett had to cure any Buzbee Tract title problem, and if it could not be cured, the contract would terminate unless the Railroad waived its objections. Instead of attempting to cure the Buzbee Tract title problem, Fawcett elected to terminate the contract under the 10% provision in Paragraph 3D.

We are restricted by the parties' agreement in Paragraph 3D that "[t]he sales price will be adjusted based on the survey required by Paragraph 6B, and the number of acres over or under 5000 acres will be multiplied by $950.00 per acre. . . . [I]f the amount set out in 3A is to be adjusted by more than 10%, either party may terminate this contract and the earnest money will be refunded to Buyer." There is no provision in the sales contract, including its exhibits, where the parties agreed that the survey would be reduced by acreage to which Fawcett did not have good and marketable title. The trial court erred in deducting the acreage of the Buzbee Tract and the Goundie Tract from the surveyed acreage of 5,531.6 acres for purposes of the termination provision in Paragraph 3D.

Title problems are not relevant to the termination provision in Paragraph 3D. The parties specifically agreed that the contract could be terminated by either party if the final survey included acreage that varied more than 10% from the 5,000 acres. The Railroad did not prove that the survey was inaccurate and stipulated that the survey included 5,531.6 acres, a variance of over ten percent. Every surveyor who testified at trial agreed that Lawson did the survey correctly and that his survey included 5,531.6 acres. Either party could terminate the contract because of the 10% variance.

6

*The Buzbee Tract and the Goundie Tract*

The Railroad argues that the Buzbee Tract and the Goundie Tract should not have been included in the survey because Fawcett had no title to either tract at the time the contract was signed. The Railroad reasons that the Buzbee family had gained title by limitations and that the Goundie Tract had not been conveyed from Waddell to Fawcett. Fawcett's use of a survey that included those tracts for termination under Paragraph 3D was, therefore, wrongful and a default under the contract. We disagree.

The Railroad's premise that Fawcett had no title to the tracts is incorrect. The Railroad stipulated, and the record shows, that Fawcett has had record title to the Buzbee Tract since 1997. Because Fawcett had record title to the Buzbee Tract, that tract was correctly included in Lawson's survey; Fawcett could have conveyed his record title to the Buzbee Tract. The Goundie Tract was also correctly included within the perimeter survey because it was an interior tract and Fawcett had equitable title to the Goundie Tract. A lack of good and marketable title to the tracts was another matter to be dealt with as provided in Paragraph 6B of their contract. The trial court erred in its findings that Fawcett had no title to the two tracts.

The Buzbee family intervened in this suit with a trespass to try title claim to the 73-acre Buzbee Tract. The Railroad acknowledged that it was paying the legal fees for the Buzbees. The trial court found that the Buzbees had acquired title by limitations. Although that was determined after Fawcett terminated under Paragraph 3D, it demonstrates that Fawcett could not have cured the Railroad's objection to the title commitment's exception to the Buzbee Tract. Paragraph 6B provided the remedy had there been no termination under Paragraph 3D: the Railroad could waive its objection and accept the record title or it could terminate the contract.

The Railroad correctly states that the sales contract is to be interpreted as a whole in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless and no single provision taken alone will be given controlling effect. *Stewman Ranch, Inc. v. Double M. Ranch, Ltd.*, 192 S.W.3d 808, 810 (Tex. App.—Eastland 2006, pet. denied); *McMillan v. Dooley*, 144 S.W.3d 159, 175 (Tex. App.—Eastland 2004, pet. denied). We find that the provisions of this contract do not conflict and that all provisions may be given meaning.

7

The parties typed an insert in Paragraph 2 of the sales contract that the new survey and legal description would be attached as an Exhibit A-1 that would replace Exhibit A.  In Paragraph 2 of their Exhibit C addendum, the parties provided that the "survey shall be a perimeter survey" and "[t]he acreage determined by the Survey shall be conclusive as to the area to be conveyed for all purposes."  Paragraph 2 does not state that "good and marketable title" to the area will be conveyed, and Fawcett could have conveyed his record title to the Buzbee Tract.  In Paragraph 3 of Exhibit C, the parties agreed that the metes and bounds description of the survey would be substituted for the "description of the Property contained in the TREC Farm and Ranch Contract and shall become the legal description of the Property being conveyed."

Paragraph 6B of the sales contract provided the Railroad the remedy of terminating or waiving its title objection to the commitment's exception of the Buzbee Tract, but there is no provision stating that the Railroad could simply reduce the survey by deleting acreage with title problems.  The Railroad's objection was that the title commitment should not except the Buzbee Tract from its insurance.  The Railroad did not object to the Buzbee Tract being included in the perimeter survey.

Paragraph 3D provided that "[t]he Sales Price will be adjusted based on the survey required by Paragraph 6B, and the number of acres over or under  5000  acres will be multiplied by  $950.00 per acre." Paragraph 3D then further provides that, "if the amount set out in 3A [$4,750,000] is to be adjusted by more than 10%, either party may terminate this contract and the earnest money will be refunded to Buyer."  Again, there is no provision that the survey would be adjusted to include only acreage to which Fawcett had good and marketable title or that the survey would be adjusted to exclude acreage where he lacked title.

The parties replaced the standard default provision in Paragraph 15 of the sales contract with their own special provision in Paragraph 11 in Exhibit C:

> If Seller fails to comply with this Contract, Seller will be in default, and Buyer's sole and exclusive remedy will be to either (i) enforce specific performance . . . without any warranty of title greater than that contained in the Special Warranty Deed to be signed by Seller and delivered to Buyer, or (ii) terminate this Contract and receive a return of the earnest money. . . . Buyer shall not be permitted to specifically enforce any term or condition in the Contract except to cause Seller to convey the property by a Special Warranty Deed.

8

Fawcett's holding of record title only to the Buzbee Tract was not a default under their contract. The parties provided the usual method of dealing with title problems in Paragraph 6B – if Fawcett could not cure his lack of good and marketable title to a tract, the Railroad had the option of waiving the objection and accepting what title Fawcett could convey by special warranty deed (record title) or simply allowing the contract to terminate. Had Fawcett not exercised his right to terminate, the Railroad could have obtained specific performance requiring Fawcett to convey his record title. Paragraph 11 did not change the clear language of Paragraph 2 in Exhibit C: "The acreage determined by the Survey [was to] be conclusive as to the area to be conveyed for all purposes." Thus, the survey was conclusive as to the area in the 10% termination provision in Paragraph 3D unless the Railroad made a successful objection to the survey under Paragraph 6B. But the Railroad did not object to the acreage of either the Buzbee Tract or the Goundie Tract being included in the survey.

We do not agree with the Railroad's assertion that the method of Paragraph 6B for dealing with title problems to acreage included in the survey was not the exclusive remedy for dealing with title issues. The provision is a standard one in the TREC Farm and Ranch Contract that is specifically designed to deal with title objections to acreage being conveyed.

The Railroad makes three arguments concerning the Goundie Tract: (1) the contract did not authorize or instruct the surveyor to prepare a survey that included the Goundie Tract because the Goundie Tract was not included in the legal description in Exhibit A of the property to be conveyed; (2) the Railroad did not waive objections to Fawcett having no title to the Goundie Tract because there was nothing in Exhibit A-1 to put the Railroad on notice that the Goundie Tract had been included; and (3) Fawcett did not have any title to the Goundie Tract.

The Railroad's first argument is that the legal descriptions in the original Exhibit A to their contract did not include the Goundie Tract; therefore, Lawson should not have included it in his survey. This argument ignores the plain language of Paragraph 2 of Exhibit C that the survey was to be a perimeter survey to show "all acreage contained in the property" and that the new survey was to be Exhibit A-1, replacing Exhibit A. Exhibit C-1 to their contract, the letter from Lawson to Roger Fawcett and initialed by both parties, reflects that the parties wanted a "plat showing the boundary lines of [Fawcett's] property as described in [Fawcett's] deed." The outside perimeter

9

boundary lines of the ranch were described in Exhibit A, although Lawson made corrections to them in Exhibit A-1.

Omission of the Goundie Tract would have left a hole in the interior of the ranch. At trial, Lyons and Curtis (surveyors for the Railroad) testified that the survey correctly showed 5,531.6 acres. Crouch, another surveyor for the Railroad, also agreed that Lawson's survey was correctly done. Under Paragraph 6B, the Railroad was given seven days to make objections to the commitment or the survey. Thus, the Railroad had seven days to have its attorneys compare Lawson's survey with the original description in Exhibit A. The Railroad then had to make an objection to the new survey or any such objection was contractually waived.[3]

In its second argument, the Railroad argues that it did not waive objections "to Fawcett having no title to the Goundie Tract" because nothing in the commitment or survey "disclosed" Fawcett's lack of title. That is too narrow a reading of the word "disclosed" in Paragraph 6B's contractual waiver provision. The new Exhibit A-1 survey and survey map revealed or disclosed that the Goundie Tract was included. The commitment also listed the Goundie Tract. It was incumbent on the Railroad to examine the survey and survey map and object to the Goundie Tract being included. However, even if the Railroad had objected to the Goundie Tract being included, that objection would have contravened the parties' agreement in Paragraph 2 of Exhibit C on how the survey was to be done. The Railroad's real problem was the termination provision in Paragraph 3D did not limit the acreage to be conveyed to acreage to which Fawcett had good and marketable title.

The Railroad's third argument – because Fawcett had no title to the Goundie Tract, it should have been excluded from the survey – also is contrary to the language of the sales contract. The survey determined the acreage included in the perimeter of the ranch as designated by its metes and bounds; objections to title or lack of title to any of that acreage had to be made under Paragraph 6. All witnesses agreed – and the trial court found – that a surveyor does not determine title to the land

---

[3]The Railroad cites several cases for the proposition that it did not intentionally waive any of its rights: *U.S.Fid. & Guar. Co. v. Bimco Iron & Metal Corp.,* 464 S.W.2d 353, 357 (Tex. 1971); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89 (Tex. 1996); and *Guzman v. Ugly Duckling Car Sales of Tex., L.L.P.*, 63 S.W.3d 522, 528 (Tex. App.—San Antonio 2001, pet. denied). The cases are inapposite. Here, the waiver involved is a contractual waiver under Paragraph 6 that does not require a showing of intent. These cases would only be applicable to an argument by the Railroad that Fawcett by conduct had waived the Railroad's failure to object under Paragraph 6.

being surveyed. Lawson correctly followed the contract's provisions concerning his survey when he included the Buzbee Tract and Goundie Tract.

Under the terms of the contract, it does not matter whether Fawcett had any title to the Goundie Tract when he terminated the contract relying on the terms of Paragraph 3D; it only mattered whether the survey was done correctly. If not, the parties had to object to the survey under Paragraph 6B.

As it turned out during the trial, Fawcett actually had equitable title to the Goundie Tract.[4] That was why the title company was willing to insure title to the Goundie Tract and included it in its title commitment. When Lawson wondered why the Goundie Tract, an interior tract, had not been included in the deed description to Fawcett (Exhibit A), he found that a 1966 deed from E.M. Beddo and wife to Waddell had been misfiled at Elliott & Waldron Abstract Company. Therefore, the Beddo deed covering the Goundie Tract was not picked up when Elliott & Waldron closed the sale from Waddell to Fawcett in 1997, although Beddo had conveyed title to the Goundie Tract to Waddell. Waddell had always paid all taxes on the Goundie Tract. Curtis, the Railroad's surveyor, testified that, if he had done the survey, he would have included the Goundie Tract "in a perimeter survey" of the ranch. Fawcett had title, although it was not record title. The trial court's findings that Waddell and Fawcett had no title to the Goundie Tract are wrong as a matter of law.

At trial, Fawcett demonstrated that it could have easily corrected any title problem to the Goundie Tract and then conveyed good and marketable title, just as the title company had concluded by its commitment. After the Railroad filed its suit, Fawcett obtained a deed without warranty from Waddell to Fawcett that covered the Goundie Tract. Marsha Waddell Moller, Earl Waddell's granddaughter, testified that Waddell's intent in 1997 was to sell the entire ranch to Fawcett, including the Goundie Tract.

Bertel testified that the Railroad had drafted the language about the survey being conclusive. In *Hooks v. Cook*, 345 S.W.2d 592 (Tex. Civ. App.—Houston 1961, writ ref'd n.r.e.), the contract

---

[4]The record reflects that Fawcett had title by the concept of strips and gores. The 57-acre tract was small in comparison to the total acreage of the ranch, it was surrounded by the land conveyed to Fawcett, it belonged to Waddell at the time of conveyance to Fawcett, and the tract was insignificant. *Glover v. Union Pac. R.R. Co.,* 187 S.W.3d 201, 212 (Tex. App.—Texarkana 2006, pet. denied). We again emphasize that Fawcett was not required to prove that it had title to the Goundie Tract. The Railroad failed to object to its inclusion in the survey.

11

provided that the surveyor's acreage determination would be binding on both parties. The appellate court held that a mutual mistake, even if material, did not override the contract. The Railroad has attempted to distinguish this case on the ground that Lawson did not perform the survey in accordance with the sales contract between Fawcett and the Railroad. But Lawson did perform his survey as their sales contract directed. *Hooks* is authority for Fawcett's argument that Lawson's survey was conclusive for purposes of the 10% termination provision in Paragraph 3D, regardless of how title questions would have been resolved under Paragraph 6.

*The Mutual Mistake*

Both parties agree that Lawson made a mistake that caused the parties to put in 5,000 acres. The Railroad contends that their mutual mistake in writing 5,000 acres in Paragraphs 2 and 3 warranted a reformation of the contract and that the trial court properly reformed the contract.

The Railroad argues that the evidence in the record demonstrated that neither party cared whether the ranch contained 5,000 acres or 5,531.6 acres, i.e., that their agreement was for Fawcett to sell all of the acreage of the ranch at a price of $950 per acre. The Railroad cites to the following testimony at trial by Roger Fawcett:

> Q.     And so if Mr. Lawson had told you 5,531.6 on the day you signed that contract, you would have put 5,531.6 in the blank, right?
>
> A.     That is right.

In support of its argument, the Railroad cites *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987), where the supreme court stated that "reformation requires two elements: (1) an original agreement and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing." There must be an actual agreement that was reached prior to the drafting of the instrument involved. *Id.* at 379.

It does not appear from the record that the parties had reached an agreement before their mutual mistake in writing in the number of 5,000 acres. The Railroad first offered $865 an acre for 5,370 acres as opposed to the asking price of $1,050. In rejecting that offer, Roger Fawcett faxed Bertel noting that "[p]reliminary discussions with the surveyor are indicating a total of 5,000 acres +/−, instead of the 5,300 previously thought" and attached a $975 per acre counteroffer. Then on March 4, Bertel faxed Fawcett a counteroffer of $945 per acre for 5,000 acres with the offered

12

purchase price of $4,725,000 to be adjusted at closing by the final acreage determined by the new survey. The parties stipulated that on March 13 there was an e-mail from the Railroad's lawyer proposing a rewrite of a paragraph. At one point, Bertel agreed that he and Fawcett had relied on Lawson's estimate before they signed the contract. The sales contract was signed on March 18, 2002.

Roger Fawcett's statement was only an acknowledgment that he was relying on Lawson to provide the base number for Paragraph 3D at the time they entered the contract. It is not evidence that the parties had reached an agreement on 5,531.6 acres as a base before the mutual mistake was made. There is no evidence in the record to support the trial court's finding that the parties had reached an agreement before their mutual mistake. Reformation, an equitable remedy, was not available to the Railroad under the facts of this case. Equity cannot be invoked to create a contract that the court considers should have been made but was not. *Ulhorn v. Reid*, 398 S.W.2d 169, 175 (Tex. Civ. App.—San Antonio 1965, writ ref'd n.r.e.). To obtain reformation, the Railroad had to prove the true agreement of the parties; it was not enough to show that both parties were mistaken about some feature of their bargain. *Nat'l Resort Cmtys., Inc. v. Cain*, 526 S.W.2d 510, 513 (Tex. 1975). Although the surveyor gave an erroneous estimate, the record reflects that the parties used that figure when they agreed on a sales price and set a base number of acres for the termination provision.

Paragraph 3D was material to the transaction. A 10% variance meant an adjustment of over $500,000 to the estimated price of $4,750,000. From the terms of Paragraph 3D, the parties obviously considered the 10% provision material at the time they entered into the contract. One would normally think of Paragraph 3D as protecting the buyer if the purchase price was going to exceed 10% of the estimated purchase price and protecting the seller if the purchase price was going to be less than 90% of the estimated purchase price. For example, assume that the Railroad only had a financing commitment that was limited to no more than 10% above the estimated price. Paragraph 3D gave the Railroad an automatic way to terminate the contract. Fawcett, on the other hand, had a way to terminate the contract if he was going to be paid an amount that would be less than 10% of the estimated purchase price and needed (or simply wanted) an amount closer to the estimated purchase price. Here, however, Fawcett terminated under Paragraph 3D even though he

13

was going to receive more for the ranch than anticipated. Under the terms of Paragraph 3D, he was permitted to do so.

We need not consider whether to grant rescission to Fawcett. By the terms of their contract, he was entitled to terminate their sales contract under the provisions of Paragraph 3D.

*Other Equitable Theories*

We also find that there is no evidence to support the trial court's findings that Fawcett could not terminate the contract under Paragraph 3D because of estoppel, unclean hands, waiver, and laches. The record reflects that, until Fawcett terminated the contract on May 13, both parties took only steps that were consistent with performing under the contract. The Railroad has not pointed this court to any evidence that would demonstrate some sort of detrimental reliance on a contract modification. At trial, the Railroad referred to a telephone call from Roger Fawcett to Jane Morgan, the broker, to support a theory that Fawcett had ratified a modification to the contract that Paragraph 3D would be ignored. That testimony by Fawcett, Morgan, and Bertel was at best ambiguous. When asked if he called Morgan when the number of acres came back at 5,531.6 acres, Fawcett answered, "I don't know." Roger Fawcett was then asked if he told Morgan to call Bertel to see "if he was going to stay hitched." He answered, "I vaguely remember talking to her about it somehow."

Morgan testified that there was some correspondence that indicated that Fawcett asked her to call and see if Bertel "would stay hitched," but she did not recall the actual conversation. She also said that the correspondence led her to believe that she did follow up "because [she did] know that [Bertel] still wanted to buy it and [Fawcett] still wanted to sell it."

Bertel testified that, after he received information about the increase to 5,531.6 acres, he heard from Morgan. Morgan said that, in view of the dramatic increase in acreage, she "wanted to assure herself, and I believe Mr. Fawcett, that [Bertel] was still interested in going forward." Bertel said he told Morgan that he was. Morgan testified that it was more land than anyone thought and that every indication from Bertel was that he still wanted to buy the ranch, "if [Fawcett] still wanted to sell it to him."

14

Fawcett further testified that he ultimately found out that Bertel wanted to go ahead with the sale. He was asked whether he was concerned when the number came back that the Railroad might get out of the contract. Fawcett's response was as follows:

> I wouldn't call it concerned. I didn't give it a lot of thought. If he wanted to stay, he could; and if he wanted to leave, he could. I mean, that was the contract. He had all kinds of outs on that contract.

The evidence referred to does not support the equitable theories found by the trial court. The Railroad has not pointed us to other evidence in the record to support those equitable theories.

Nor has the Railroad provided us with argument and record citations to support the trial court's finding that "[Fawcett] waived its right to terminate the contract" or that Fawcett was barred by laches or had unclean hands. Waiver consists of full knowledge of a known right (such as the parties' rights under Paragraph 3D) and intentional conduct inconsistent with claiming that known right. *See EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89 (Tex. 1996); *U.S. Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971). Laches requires an unreasonable delay in asserting a right and a detrimental change in position by the other party. *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). We have found no evidence in the record supporting a finding of an unreasonable delay by Fawcett in exercising his right of termination under Paragraph 3D, nor has the Railroad provided us with that evidence.

We have found no evidence to support the trial court's finding that Fawcett could not terminate the contract because of unclean hands. That concept involves the denial of relief to a litigant whose conduct has been unconscientious or unjust or violates the principles of equity and fair dealing. *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 559 (Tex. App.—San Antonio 1997, no pet.). There was evidence in the record that, just before Fawcett terminated the contract, he received a faxed higher offer for the ranch on May 13. However, the contract expressly stated in Paragraph 6C(7) that, unless expressly prohibited in writing by the parties, Fawcett could continue to show the ranch for sale "and to receive, negotiate and accept back-up offers."

There also was evidence that there was a meeting on May 7 attended by Fawcett, Bertel, and James Lattimore, who represented Allied Waste, a landfill company. It appears that Fawcett had been negotiating with Lattimore to receive a payment and property improvements in exchange for

15

dropping his opposition to a proposed landfill near the ranch. Bertel had also been discussing matters with Allied. The record reflects that Fawcett and Bertel disagreed over whether the Railroad would share in any payment from Allied. We do not find that evidence sufficient to support a finding that Fawcett acted with unclean hands.

*Summary*

Paragraph 2 of the contract described the property as 5,000 acres, more or less. Paragraph 3D used 5,000 acres to calculate the estimated price of the ranch as 5,000 acres times $950 per acre or $4,750,000. Paragraph 3D also provided a termination right to either party if the final survey required by Paragraph 6B resulted in a variance of more than 10% when the acres contained in the survey were multiplied by $950 per acre. The parties agreed in Paragraph 2 of Exhibit C that the survey would be a perimeter survey and that the acreage determined by the survey would be conclusive as to the area to be conveyed. In surveying the ranch, the surveyor correctly followed the instructions in Exhibits C and C-1 of the contract.

Under Paragraph 6B, the Railroad had seven days to object to any title commitment exceptions or problems with the survey. This included any objections to title problems concerning the Buzbee Tract or the Goundie Tract or to those tracts being included within the survey. The title commitment excepted the Buzbee Tract from its insurance coverage, and the Railroad objected to that exception. The Railroad did not object to the title company's commitment to include and ensure title to the Goundie Tract. By the terms of Paragraph 6B, Fawcett had to cure any Buzbee Tract title problem and, if it could not be cured, the contract would terminate unless the Railroad waived its objections.

Paragraph 2 of Exhibit C does not require that the survey was to only include acreage to which Fawcett had good and marketable title. Paragraph 4a in Exhibit C required Fawcett to convey good and marketable title at closing "subject only to taxes for the current year, and any Title exceptions permitted by the terms of the Contract." Title exceptions permitted by the contract included (1) the title exception to insurance coverage of the title to the Buzbee Tract to which the Railroad objected and (2) the inclusion of the Goundie Tract within the survey to which the Railroad failed to object within the seven days as required by Paragraph 6B. Had Fawcett not terminated the contract under the provisions of Paragraph 3D, the Railroad's remedy if Fawcett could not cure the

16

title problem to the Buzbee Tract would have been (1) to waive its objection and accept a special warranty deed conveying only Fawcett's record title or (2) to terminate the contract. Had the Railroad objected to the inclusion of the Goundie Tract within the perimeter survey, Fawcett would have had an opportunity to clear up the title problem. Assuming that before closing the Railroad had not terminated the contract because of Fawcett's holding only record title to the Buzbee Tract, both tracts would have been included in the final calculation of the purchase price. That purchase price would have varied more than 10% from the initial estimated price.

Title problems were not relevant to the termination provision in Paragraph 3D. The Railroad did not prove that the survey was inaccurate. The survey included 5,531.6 acres and resulted in a variance of more than 10% under Paragraph 3D. Either party could have terminated the contract.

*This Court's Ruling*

The judgment of the trial court is reversed, and judgment is rendered for Fawcett.

TERRY McCALL

JUSTICE

May 14, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

17